UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KATENA COMPUTING TECHNOLOGIES, INC.,<br>    Petitioner,<br><br> -against<br><br>JIM DENAUT,<br>    Respondent,<br><br>and<br><br>COINMINT, LLC,<br>    Intervenor-Defendant. | Case No. 3:23-mc-48-MPS<br><br><br><br><br><br><br><br><br><br>AUGUST 25, 2023 |

**POST-HEARING BRIEF OF INTERVENOR DEFENDANT COINMINT LLC**

  Intervenor-Defendant, Coinmint LLC ("Coinmint") submits this post-hearing brief on the issues raised by Jim DeNaut ("DeNaut") who seeks to: (1) to disqualify Attorney Fletcher Alford ("Alford") and Gordon Rees Scully Mansukhani, LLP ("Gordon Rees") from questioning DeNaut when he gives testimony to be used in an arbitration proceeding between Coinmint and Katena Computing Technologies, Inc. ("Katena"), which is pending in California, and (2) prevent Gordon Rees or its client Coinmint from using information it obtained when interviewing DeNaut on January 6, 2023.

**I.  INTRODUCTION**

  The evidence presented during the two-day hearing on August 7th and 8th establishes that Coinmint held DeNaut out to its employees, clients, customers, and vendors that he was the CEO of Coinmint and that Katena understood and believed DeNaut was Coinmint's CEO. Although DeNaut testified he was not Coinmint's CEO, he acknowledged that when he was identified as Coinmint's CEO in written correspondence and documents, he did not dispute or correct that fact in writing. Randall Foret ("Foret"), Coinmint's General Counsel, also testified he understood and believed DeNaut was Coinmint's CEO and that he and other employees took direction from

DeNaut in their day-to-day functions. Because of his status as the former CEO of Coinmint, Coinmint and its lawyers at Gordon Rees were aware that Coinmint may have owed certain obligations to DeNaut under the Coinmint LLC Operating Agreement and applicable law in relation to the arbitration proceedings. *See* Limited Liability Company Agreement of Coinmint, LLC, attached as Exhibit A, at pp. 17-18. Nevertheless, those obligations of indemnification and representation in relation to legal matters on behalf of Coinmint depended on DeNaut not having been adverse to Coinmint or acting against its interests. And at the time of the January 6, 2023, phone call, neither Coinmint nor its Gordon Rees lawyers had any reason to believe that DeNaut might not be entitled to those obligations.

However, as DeNaut made clear during the hearing, DeNaut did not believe he had ever acted as Coinmint's CEO. Indeed, DeNaut testified he was only an "advisor" to Coinmint and was never employed by Coinmint in any capacity. As a mere advisor to Coinmint, DeNaut could not have reasonably believed that Coinmint had any obligation to provide him with legal representation. Further, as the record makes clear, DeNaut failed to disclose to Coinmint or its lawyers — either before or during the January 6th call — that the work he had done for Katena had been adverse to Coinmint's interests. For example, DeNaut discussed forming a joint venture to mine Bitcoins with the CEO of Katena, which would have competed with Coinmint and been against Coinmint's interests. He also led Coinmint to believe that he was acting on Coinmint's behalf to try to resolve the dispute with Katena, yet his communications with Katena's CEO show that he was not advancing Coinmint's interests and was instead acting on behalf of Katena. Because he had acted against Coinmint's interests in advising Katena, he could not have had a reasonable expectation that Coinmint's lawyers would represent him, even if he were the former CEO of Coinmint. To be clear, had DeNaut disclosed to the Gordon Rees lawyers that he did not

2

believe he was the former CEO of Coinmint or that he had been working with Katena against Coinmint's interests, which one would expect a prospective client to disclose to his lawyers under the circumstances, the Gordon Rees lawyers would have terminated the January 6th call with DeNaut immediately.

As discussed in more detail below, whether DeNaut can disqualify Alford and Gordon Rees from examining him at the arbitration hearing and using information disclosed during the January 6th call turns on whether DeNaut can prove he had a reasonable belief he had entered into an implied attorney-client relationship with lawyers at Gordon Rees. That, in turn, requires DeNaut to prove he provided information to the Gordon Rees lawyers, **in confidence,** during the January 6th call, for the purpose of obtaining legal advice from them. Nevertheless, the presence of Foret during the January 6th call necessarily prevented DeNaut from providing information to the Gordon Rees attorneys in confidence. Also, as DeNaut testified during the hearing, the information he provided to the Gordon Rees attorneys during the call was not confidential information relating to himself. Rather, it was information relating to Coinmint. Because DeNaut cannot prove he provided confidential information to the Gordon Rees attorneys, or that he requested and they agreed to provide him with legal advice, he cannot prove he ever formed an attorney-client relationship with them. Therefore, there is no basis to disqualify Alford and Gordon Rees from questioning him during the arbitration or using information learned during the January 6th call.

The Court also requested the parties to provide additional briefing on the following issues, which Coinmint has addressed as part of its Post-Hearing Brief:

1.  Once DeNaut made the "concerning" comment at the beginning of the January 6, 2023 call, Coinmint's lawyers did not stop the call or provide a clear statement to DeNaut that Alford and Gordon Rees could not represent him and could use the information he was providing against him. What was their legal obligation at that point in the call? Did they have any duty to stop the call and advise DeNaut of a potential issue, or were they free to

3

        continue interviewing him?

2.     Given DeNaut's communications with Katena during the period from April 2022 through June 2022, does the law say anything about his "reasonable belief" as to whether he could form an attorney-client relationship with Gordon Rees heading into the call on January 6, 2023?

3.     Is the arbitration panel's ruling that there was no conflict that would prevent Gordon Rees from questioning DeNaut during the arbitration entitled to any deference or should the Court decide the disqualification issue *de novo*?

## II. <u>ARGUMENT</u>

### A. **DeNaut Did Not Provide The Gordon Rees Attorneys With Confidential Information During The January 6th Call And, Therefore, He Never Formed An Attorney-Client Relationship With Them.**

The Connecticut Supreme Court has stated the rationale for disqualifying an attorney as follows: "Disqualification of counsel is a remedy that serves to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of **confidential information**. . . . In disqualification matters, however, we must be solicitous of a client's right freely to choose his counsel . . . mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel and may lose the benefit of its longtime counsel's specialized knowledge of its operations. . . . The competing interests at stake in the motion to disqualify, therefore, are: (1) the defendant's interest in protecting confidential information; (2) the plaintiffs' interest in freely selecting counsel of their choice; and (3) the public's interest in the scrupulous administration of justice." *Bergeron v. Mackler,* 225 Conn. at 391, 397–98, 623 A.2d 489 (1993) (citation omitted; internal quotations omitted; emphasis added.). When deciding whether to disqualify former counsel, the primary concern for the court is the protection of confidential information by the attorney from the client. *Id.*, *see also Klein v. Bristol Hosp.*, 50 Conn. Supp. 160, 164–65 (Super. Ct. 2006). And if there is no confidential information to protect, there is no reason to disqualify the former counsel.

Similarly, "[a]lthough considering the appearance of impropriety may be part of the inherent power of the court to regulate the conduct of attorneys, it will not stand alone to disqualify an attorney in the absence of any indication that the attorney's representation risks violating the Rules of Professional Conduct. In view of the strong public policy favoring a party's right to select its own counsel, the law places the burden of showing that disqualification is required upon the moving party." *Weingarden v. Milford Anesthesia Assocs., P.C.*, No. NNHCV116016353S, 2013 WL 3119578, at *3 (Conn. Super. Ct. May 30, 2013) (citations and internal quotations omitted.). In order to disqualify an attorney under Rules 1.8 or 1.9 of the Rules of Professional Conduct, a party bears the burden of proving that an attorney-client relationship existed, or the party had a reasonable expectation that he or she could form an attorney-client relationship with the attorney. *Id.* at *4, 8; *see also Feldman v. Feldman,* No. FA124119410, 2013 WL 2501988, at *2 (Conn. Super. Ct. May 22, 2013) (noting a party moving to disqualify counsel bears the burden of establishing that an attorney-client relationship existed between the party moving for disqualification and the attorney they seek to disqualify).

"An attorney-client relationship is established when the advice and assistance of the attorney is sought and received in matters pertinent to his profession." *DiStefano v. Milardo*, 276 Conn. 416, 422 (2005). The relationship is based on principles of agency, so the attorney "must be authorized to act for the client and […] the client must exercise control over the attorney," for a relationship to exist. *In re Gold*, 533 B.R. 851, 859 (D. Conn. 2015), *aff'd sub nom. Matter of Gold*, 654 Fed. Appx. 14 (2d Cir. 2016) (*citing* 7 Am. Jur. 2d Attorneys at Law § 137 (2015)); *see Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 510, 4 A.3d 288 (2010) (noting that agency principles apply to attorney-client relationships). This court has noted that, "An attorney-client relationship is said to exist when the party *divulging confidences and secrets* to an attorney believes

that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.*, 578 F. Supp. 1280, 1283 (D. Conn. 1984) (emphasis added).

"[T]he mere fact than at attorney's actions may benefit a third party does not and cannot create an attorney-client relationship with that third party." *In re Gold*, 533 B.R. at 860 (citing *DiStefano*, 276 Conn. at 423, 886 A.2d 415). It is undisputed that an attorney-client relationship exists between Coinmint and Gordon Rees. Because DeNaut is the former CEO of Coinmint, Gordon Rees and Coinmint believed that Coinmint might have had an obligation to provide him with legal representation in connection with his testifying during the arbitration. *See* Exhibit A, Section 4.8. Therefore, DeNaut was a third-party that potentially stood to benefit from Gordon Rees carrying out its obligations to Coinmint. It is within that context that Gordon Rees, as counsel to Coinmint, and Coinmint, through its General Counsel, sought to interview DeNaut. The fact Coinmint directed the Gordon Rees attorneys to speak with DeNaut on January 6th, which might have benefitted DeNaut if they had agreed to represent him in connection with the arbitration, does not and cannot create an attorney-client relationship with DeNaut. *In re Gold*, 533 B.R. at 860.

During the January 6th call, DeNaut never sought the "advice and assistance" of Gordon Rees for himself, nor did DeNaut receive any advice or assistance from the Gordon Rees lawyers for himself. *See* Transcript of the hearing on 8/7/23 ("8/7 Hr'g Tr.") at pp. 180-185. DeNaut testified that he asked for legal advice regarding how he might present testimony during the arbitration hearing pertaining to the topic of Coinmint's ability to pay for the purchase order from Katena. *See* 8/7 Hr'g Tr. at pp. 183-84. Nevertheless, any advice that might have been given was not to assist DeNaut, but to assist Coinmint, for whom DeNaut would be testifying. Going into the January 6th call, DeNaut knew he had been advising both Coinmint and Katena. *See* 8/7 Hr'g

6

Tr. at pp. 172-74. He also knew that the interests of Coinmint and Katena were adverse. *Id*. Despite that, he never told Foret or anyone at Coinmint that he had been advising Katena. *Id*. DeNaut also testified he was never employed by Coinmint and never acted as Coinmint's CEO, despite the fact that he was identified as Coinmint's CEO in numerous emails and other written documents. *See* 8/7 Hr'g Tr. at pp. 37-29; 100-02. DeNaut never told Foret that he did not believe he was Coinmint's former CEO. *See* 8/7 Hr'g Tr. at pp. 210-11. During the January 6th call, DeNaut, a sophisticated individual, could have done any of the following:

1) Continue the charade and fraudulently induce Coinmint and Gordon Rees to believe that DeNaut was continuing to act in a fiduciary and agency capacity to Coinmint;

2) Come clean about his belief that he was never the CEO of Coinmint, and thus DeNaut did not believe he was not a fiduciary or agent of Coinmint; or

3) Come clean about his working with Katena against the interests of Coinmint, and thus DeNaut knew he was no longer acting as fiduciary or agent of Coinmint.

DeNaut chose to continue the charade knowing that it would leave the false impression with Coinmint and Gordon Rees that DeNaut was continuing to act as a fiduciary and agent of Coinmint. To be clear, DeNaut never relied on Gordon Rees's professional judgment or advice because DeNaut knew there was no attorney-client relationship between Gordon Rees and him — he was merely the potential third-party beneficiary of the relationship between Gordon Rees and Coinmint as the former CEO of Coinmint. There is a conflict of interest at issue in the matter before the Court, but it has nothing to do with Gordon Rees. DeNaut cannot simultaneously endeavor to represent Coinmint while also holding adverse interests to Coinmint and serving Katena. And, until January 9, 2023, when Coinmint gained access to Katena's second set of production in the arbitration (that contained the What's App messages between Katena and DeNaut and the job offer to DeNaut), only DeNaut and Katena were aware of the conflict of interest.

7

An attorney-client relationship can be express or implied. *Montgomery Acad. v. Kohn*, 50 F. Supp. 2d 344, 350 (D.N.J.), *aff'd*, 82 F. Supp. 2d 312 (D.N.J. 1999). An express relationship exists when the parties have entered into a formal written or oral contract. There is no evidence that DeNaut entered into an express attorney-client relationship with attorneys at Gordon Rees. Although DeNaut testified that Alford told him he would represent him during the arbitration and would send him an engagement letter, DeNaut acknowledged that he never received an engagement letter from Gordon Rees. *See* 8/7 Hr'g Tr. at p .187. He also testified that following the January 6th call, he never followed up to obtain an engagement letter from Gordon Rees and he never communicated with anyone at Gordon Rees by phone or by email. *Id.* Given the fact that DeNaut was going to be presented in short order as a witness in the arbitration, these facts are particularly noteworthy as to what was in DeNaut's mind at the time. Therefore, in order to establish an attorney-client relationship between himself and Gordon Rees, DeNaut must prove the existence of an implied attorney-client relationship.

Courts have noted that an implied attorney-client relationship can arise from a preliminary consultation by a prospective client with a view to retention of a lawyer, although actual employment does not result. *See Westinghouse Elec. Corp. v. Kerr–McGee*, 580 F.2d 1311, 1319 (7th Cir. 1978); *see also Guerrero v. Bluebeard's Castle Hotel Inc.,* 37 V.I. 344, 349–50, 982 F. Supp. 343, 346–47 (D.V.I. 1997); *Polyagro Plastics v. Cincinnati Milacron, Inc*., 903 F.Supp. 253, 256 (D.Puerto Rico 1995). Nevertheless, to establish an implied attorney-client relationship "a party must show (1) that it submitted **confidential information** to a lawyer, and (2) that it did so with the reasonable belief that the lawyer was acting as the party's attorney." *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc*., 657 F.Supp. 1486, 1495 (N.D.Ill. 1987) (emphasis added); *Guerrero*, 982 F.Supp. at 347 ("An implied attorney-client relationship arises, however,

8

only if **confidential information** is in fact transmitted from the prospective client to the lawyer, and if the prospective client divulged such confidences with the reasonable belief that the lawyer was acting as the party's attorney.") (emphasis added); *Polyagro Plastics*, 903 F.Supp. at 257 (same); *see also First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F.Supp. 233, 238 (S.D.N.Y. 1994) ("an attorney-client relationship exists if the party divulging **confidences and secrets** to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice") (emphasis added); *Trinity Ambulance Serv.,* 578 F. Supp. at 1283 (same).

DeNaut cannot prove that an implied attorney-client relationship arose between him and the lawyers at Gordon Rees because he had no reasonable expectation he was sharing confidential information (setting aside the fact that everyone was already aware of the alleged information) with them during the January 6th call. It is undisputed that Foret, Coinmint's General Counsel, reached out to DeNaut to schedule the call with the Gordon Rees attorneys. *See* 8/7 Hr'g Tr. at pp. 63, 169, Exhibit 36. Foret participated during the call along with Alford and his partner, Robert Lemus. *See* 8/7 Hr'g Tr. at pp. 64-65, 171. Any information that DeNaut shared with Alford and Lemus during the January 6th call was not confidential because of the presence of Foret. *Olson v. Accessory Controls & Equipment Co.*, 254 Conn. 145, 157 (2000) ("Statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality."). Moreover, DeNaut testified that during the call he provided information to the Gordon Rees attorneys regarding certain topics including the negotiating and signing of the purchase agreement between Coinmint and Katena, the ability of Coinmint to pay for the equipment, and the identity of the person who signed the contract. *See* 8/7 Hr'g Tr. at pp. 175-77. None of that information was confidential to DeNaut and was already known to the participants

on the call.[1]

DeNaut also testified he sought legal advice from Gordon Rees regarding his testimony at the arbitration hearing concerning the topic of Coinmint's ability to pay.  *See* 8/7 Hr'g Tr. at pp. 182-84.  Even if DeNaut had sought legal advice from the Gordon Rees attorneys, which is disputed was not provided, the legal advice would have pertained to DeNaut's ability to testify as a witness on behalf of Coinmint.  In other words, DeNaut was not seeking legal advice for himself, but for Coinmint.  Furthermore, the fact that Foret participated on the January 6th call means that DeNaut cannot show he gave confidential information to Gordon Rees attorneys.  *Olson*, 254 Conn. at 157.  Because DeNaut cannot meet his burden of showing the existent of an express or implied attorney-client relationship between him and Gordon Rees, there is no basis to disqualify the Gordon Rees attorneys from questioning him during the arbitration hearing or using information he gave them during the January 6th call.

> **B.     The Purpose Of The January 6th Call Was To Obtain Information From DeNaut And Was Not To Establish An Attorney-Client Relationship With Him And Therefore, Once DeNaut Made The "Concerning" Comment, The Gordon Rees Attorneys Did Not Have Any Obligation To Stop The Call.**

When Foret reached out to DeNaut to schedule the January 6th call, Foret made it clear that he and Coinmint's lawyers at Gordon Rees were interested in talking with DeNaut about his conduct and knowledge gained during his employment with Coinmint in order to assist Coinmint in obtaining legal advice from its lawyers.  *See* 8/7 Hr'g Tr. at pp. 226-28.  The purpose of the call was not to establish an attorney-client relationship between Gordon Rees and DeNaut.  *Id.*; *see also* Transcript of the hearing on 8/8/23 ("8/8 Hr'g Tr.") at pp. 47, 59.  The purpose was to review

---

[1] Because the information DeNaut disclosed during the January 6th was already known by Coinmint and the Gordon Rees attorneys, DeNaut cannot show that Coinmint is seeking to use information he disclosed during the call against him.  The information that Coinmint is seeking to use against DeNaut is information it learned from the documents produced by Katena – namely, that DeNaut had been acting to advance Katena's interests to Coinmint's detriment.

10

the information that DeNaut had that might have been helpful to Coinmint in the arbitration. *Id.* DeNaut had been given notes of his conversations with Coinmint's former attorneys at the Choate firm and with Foret, and the Gordon Rees attorneys wanted to speak with DeNaut to clarify any questions or concerns that DeNaut had about the notes in terms of being an accurate representation of his conversations with the Choate lawyers and with Foret. *See* 8/7 Hr'g Tr. at pp. 226-28; 8/8 Hr'g Tr. at pp. 59-60. Alford also testified that there was an expectation that DeNaut would be able to provide information that would be helpful for Coinmint during the arbitration. *See* 8/8 Hr'g Tr. at p. 60. Alford thought that Gordon Rees might be able to represent DeNaut during the arbitration, but he had no idea if there was any conflict that would prevent Gordon Rees from doing so.[2] *See* 8/8 Hr'g Tr. at p. 68.

DeNaut testified that, at the beginning of the call, Alford told him that he and Gordon Rees were counsel for Coinmint. *See* 8/7 Hr'g Tr. at pp. 64-66. Therefore, DeNaut knew that the Gordon Rees lawyers were participating in the call as the lawyers for Coinmint. DeNaut also testified that he knew Foret was participating on the call on behalf of Coinmint. *See* 8/7 Hr'g Tr. at pp. 64-65, 171. When DeNaut made the comment that was "concerning" to Alford, it was not readily apparent there was an actual conflict between DeNaut and Coinmint that would prevent Gordon Rees from representing DeNaut in connection with the arbitration. *See* 8/8 Hr'g Tr. at pp. 67-69; 115-116. However, it was apparent to Alford that the issue of "concern" that DeNaut raised was a matter about which DeNaut gained knowledge during his employment with Coinmint, and thus he felt it was appropriate to continue the conversation to gather additional information about the facts of the dispute with Katena. *See* 8/8 Hr'g Tr. at pp. 48-50, 114-121. The "concerning"

---

[2] Again, the fact that Foret was going to participate, and did participate, in the call, and the fact that DeNaut knew he was not going to be able to have a confidential conversation with the Gordon Rees attorneys, necessarily means that DeNaut could not have reasonably believed he would be able to contain confidential legal advice from the Gordon Rees lawyers. *Olson*, 254 Conn. at 157.

11

comment did not signal that DeNaut was necessarily adverse to Coinmint, but it did signal that DeNaut had knowledge about the dispute with Katena that eerily echoed Katena's arbitration pleadings. *Id.* Given DeNaut's access to Coinmint's confidential information as Coinmint's CEO, the statement was not surprising in light of his knowledge. Nonetheless, there was nothing about the "concerning" comment that indicated a clear conflict of interest between DeNaut or Coinmint or that raised a serious issue with Alford as to whether Gordon Rees might not be able to represent DeNaut. *See* 8/8 Hr'g Tr. at pp. 48-50, 114-121. Therefore, the Gordon Rees attorneys had no obligation to stop the call and inform DeNaut of a conflict that did not exist at that time.

      **C.**    **Given DeNaut's Relationship With Katena, He Had No Reasonable Belief That Gordon Rees Would Be Able To Represent Him And Coinmint, Despite DeNaut Allegedly Not Speaking With Anyone At Katena Since June 2022.**

Despite DeNaut's testimony to the contrary, he acted in the capacity as CEO of Coinmint. The only reasonable belief DeNaut had going into the January 6th call was that Coinmint and its lawyers were interested in his conduct and knowledge he gained while working on behalf of Coinmint. While Coinmint was ignorant of DeNaut's exact relationship with Katena at the time of the January 6th call, DeNaut was very aware of the fact that he had advised Katena on matters that were adverse to Coinmint's interests. *See* Hearing Exhibits 23, 26, 30, 31, and 32.[3] Thus,

---

[3] Katena marked Exhibits 23, 30, 31, and 32 as "confidential" in the arbitration proceeding. During the hearing on August 7th, after the close of DeNaut's examination and after the exhibits had already been admitted into evidence, Katena's counsel noted that Coinmint had introduced those exhibits into evidence despite their being marked confidential, presumably as a predicate to filing a motion for sanctions against Coinmint with the arbitration panel. *See* 8/7 Hr'g Tr. at pp. 199-200. In addressing the issue, the Court noted that, "In my view, I entered an order on July 26, 2023, that includes that Katena was to produce any documents, correspondence, setting forth the scope of any such work performed by DeNaut for the time frame of April 21 to December of 2022. In my view, all of the exhibits that were presented today fall within the scope of the Court's order; so they are properly here in this proceeding," and specifically ruled that, "I don't believe there's any basis, at least in my view, for the arbitration panel to sanction Mr. Alford or any of the Gordon & Rees lawyers with respect to any of the exhibits that were admitted here today in this proceeding." 8/7 Hr'g Tr. at p. 206. Despite that ruling, however, on August 11, 2023, Katena filed a motion for sanctions against Coinmint in the arbitration proceeding and noted as follows: "In addition to the pre-hearing brief, Coinmint admitted five Confidential Katena documents into evidence: KATENA000201 (Hrg. Ex. 12); KATENA0007522 (Hrg. Ex. 23); KATENA007249 (Hrg. Ex. 30);

even though DeNaut testified the last contact he had with anyone at Katena was June 2022 (after Coinmint initiated arbitration against Katena), the fact that DeNaut knew Katena's interests were adverse to Coinmint's, and he had been advising Katena in a way that was against Coinmint's interests, meant he could not have had a reasonable expectation that the Gordon Rees attorneys would have been able to represent him during the arbitration hearing. *See Norwich Med. Arts Ctr., LLC v. Leone*, No. KNL-CV20-6047946, 2023 WL 2889153 (Conn. Super. Ct. Apr. 3, 2023) (noting that a party's subjective belief that an attorney-client relationship exists, standing alone, cannot create such a relationship and concluding that the plaintiff had no reasonable expectation that an attorney representing a commercial tenant could also represent a commercial landlord because the interests of the two entities were adverse). DeNaut failed to mention any of these material facts to Gordon Rees or Coinmint.

### D. Based On The Practice Of Courts In The Second Circuit, The Court Should Defer To The Arbitration Panel's Ruling And Decline To Address The Issue Of Whether Gordon Rees Should Be Disqualified.

The standard of review for decisions of an arbitration panel on issues relating to witness subpoenas and claims of privilege is extremely deferential. *Turner on behalf of Int'l Bhd. of Elec. Workers Local 1200, AFL-CIO v. CBS Broad. Inc.*, 599 F. Supp. 3d 187, 194-195 (S.D.N.Y. 2022) ("[T]he federal policy favoring arbitration counsels deference to the substantive and procedural

---

KATENA007241 (Hrg. Ex. 31); and KATENA007259 (Hrg. Ex. 32). Ex. 11 (Dkt. No. 86). This is sanctionable too, although at this time, Katena is simply noting it for the Panel given the recent Orders and the ongoing violations of the SPO that continue. While the Panel can (and should) handle this additional violation as it deems fit (particularly in light of the repeated violations of its Orders), Katena is not specifically seeking sanctions related to the disclosure of these five (5) documents. During the hearing, Judge Vatti commented that these 5 documents were likely responsive to Coinmint's Connecticut subpoena to Katena. Katena disagrees, and notes that it did not have a chance to respond to Judge Vatti on this issue or brief it." Katena's submission to the arbitration panel failed to disclose that the Court had made a ruling on the issue of whether Coinmint had properly introduced the exhibits into evidence and mischaracterized the Court's ruling by failing to note that the Court had pointed out that Katena's counsel should have objected to the exhibits at the time they were offered into evidence but failed to do so. 8/7 Hr'g Tr. at p. 205.

decisions of arbitrators. . . Section 7 [of the FAA, which addresses compelling attendance of nonparty witnesses] provides that a district court 'may compel' the attendance of witnesses and production of documents before an arbitrator . . . deference to the arbitrator's privilege and admissibility rulings (whether express or implicit) will be appropriate in the mine run of cases to avoid making a section 7 petition a vehicle to obtain, in effect, interlocutory appeal of discovery rulings obtained in arbitration."). Deference to an arbitrator's rulings follows from the United States Supreme Court's directive that "when the subject matter of a dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987) (*citing John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964)).

Courts in the Second Circuit have an extremely limited role in reviewing the decisions of arbitration panels under any circumstances. *Bailey Shipping Ltd. v. Am. Bureau of Shipping*, No. 12 CIV. 5959 KPF, 2014 WL 3605606, at *1 (S.D.N.Y. July 18, 2014) (citing *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008)). An arbitration panel may issue subpoenas to compel a non-party to testify as a witness and produce material documents. 9 U.S.C. § 7; *Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567, 581 (2d Cir. 2005). Moreover, as a general rule, arbitrators are afforded broad discretion to determine whether to hear or not hear evidence, or whether additional evidence is necessary or would simply prolong the proceedings. *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 286 (S.D.N.Y. 2007); *see also Washington Nat'l Ins. Co. v. OBEX Grp. LLC,* 958 F.3d 126, 139 (2d Cir. 2020) ("The panel is responsible for issuing summonses, hearing evidence, and ruling on objections.").

It is important to put DeNaut's request for relief into context. He is a non-party to the arbitration between Coinmint and Katena. The arbitration panel issued a summons directing him

14

to appear and provide testimony before the panel. On April 17, 2022, DeNaut submitted a letter from his attorney, Steven Kobre, to the arbitration panel. DeNaut could have supported that letter with an affidavit or declaration providing additional information to the arbitration panel as to why he thought there was a conflict that prevented Gordon Rees from questioning him. He chose not to do so. By submitting the letter to the arbitration panel, DeNaut implicitly and intentionally subjected himself to the decision of the arbitration panel.

In *Washington Nat'l Ins. Co. v. Obex Grp. LLC*, No. 18 CV 9693 (VB), 2019 WL 266681, at *6 (S.D.N.Y. Jan. 18, 2019), *aff'd*, 958 F.3d 126 (2d Cir. 2020), the court refused to hear an objection to summonses issued to non-parties to an arbitration. The respondents argued the district court had the power to rule on the merits of objections to the summonses because Section 7 of the Federal Arbitration Act does not provide a mechanism for nonparties to challenge objectionable summonses. Despite that, however, the court deferred to the decision of the arbitration panel. *Id.* (noting that courts in the Second Circuit generally decline to rule on evidentiary issues or objections to summonses issued by arbitration panels and instead defer evidentiary issues to the arbitrators). Likewise, the Court should defer to the decision from the arbitration panel not to disqualify Mr. Alford and Gordon Rees from questioning DeNaut. The fact that DeNaut is not a party to the arbitration proceeding is of no moment. *Washington Nat'l Ins.*, 2019 WL 266681, at *6.

### III.   CONCLUSION

DeNaut could not reasonably have believed that he formed an implied attorney-client relationship with the Gordon Rees since the January 6th call was not confidential. The presence of a third-party, Foret, prevented DeNaut from sharing any information with the Gordon Rees attorneys and soliciting their advice **in confidence.** Further, none of the topics on which DeNaut testified he disclosed information to Gordon Rees implicated information that was confidential to

DeNaut. Additionally, given DeNaut's relationships with Coinmint and Katena, the fact that DeNaut knew Coinmint and Katena were adverse, the fact he had assisted Katena to the detriment of Coinmint, and the fact he knew the Gordon Rees lawyers were representing Katena, means that DeNaut could not have formed a reasonable belief that Gordon Rees would also be able to represent him. Because DeNaut cannot establish an attorney-client relationship with Gordon Rees, there is no basis for the Court to disqualify Gordon Rees attorneys from questioning him at the arbitration hearing or using information learned during the January 6th call. The Court should therefore either defer to the arbitration panel and decline to rule on whether Gordon Rees should be disqualified, or it should find that there is no basis to disqualify Gordon Rees.

Respectfully submitted,

COINMINT, LLC.

By      */s/ Christopher R. Drury*
        Steven J. Zakrzewski (ct28934)
        Christopher Drury (ct26972)
        Gordon Rees Scully Mansukhani, LLP
        95 Glastonbury Boulevard, Suite 206
        Glastonbury, CT 06033
        Juris No. 432541
        Phone: 860-494-7552
        Fax: 860-560-0185
        cdrury@grsm.com
        szakrkewski@grsm.com

Its attorneys.

## **CERTIFICATION**

I hereby certify that on August 25, 2023, a copy of the foregoing POST-HEARING BRIEF OF INTERVENOR-DEFENDANT COINMINT LLC was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filings. Parties may access this filing through the Court's CM/ECF System.

*/s/ Christopher R. Drury.*
Christopher R. Drury (ct26972)