# EXHIBIT A

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# COINMINT, LLC

## (A Delaware Limited Liability Company)

**THESE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR PURSUANT TO THE PROVISIONS OF ANY STATE SECURITIES ACT**

**CERTAIN RESTRICTIONS ON TRANSFERS OF INTERESTS ARE SET FORTH HEREIN**

Table of Contents

Page

**ARTICLE 1**
Definitions ............................................................................................................... 1

**ARTICLE 2**
Organization ........................................................................................................... 8

    **Section 2.1**    Formation.................................................................................. 8
    **Section 2.2**    Name, Place of Business and Office........................................ 8
    **Section 2.3**    Registered Office and Registered Agent ................................ 8
    **Section 2.4**    Purposes and Character of Business; Powers ........................ 8
    **Section 2.5**    Term......................................................................................... 8

**ARTICLE 3**
Company Capital ................................................................................................... 9

    **Section 3.1**    Initial Capital Contributions of the Members ....................... 9
    **Section 3.2**    Additional Capital Contributions of the Members ............... 9
    **Section 3.3**    Company Capital .................................................................. 10
    **Section 3.4**    Liability of Members ........................................................... 10
    **Section 3.5**    Loans by Members or Affiliates .......................................... 11
    **Section 3.6**    Capital Accounts.................................................................. 11
    **Section 3.7**    Sharing Ratios...................................................................... 12
    **Section 3.8**    Competition ......................................................................... 12
    **Section 3.9**    Lack of Authority ................................................................ 14

**ARTICLE 4**
Board of Managers ............................................................................................. 14

    **Section 4.1**    Number and Qualifications.................................................. 14
    **Section 4.2**    Removal of Managers; Vacancies ....................................... 15
    **Section 4.3**    Meetings of Board; Quorum; Voting.................................... 15
    **Section 4.4**    Actions With or Without a Meeting and Telephone Meetings.................... 16
    **Section 4.5**    Restrictions on the Powers of Managers Acting Individually .................... 16
    **Section 4.6**    Actions of the Board Requiring Consent of a Majority of the Members ..... 16
    **Section 4.7**    Transactions with Related Parties........................................ 17
    **Section 4.8**    Indemnification of the Board and Officers. ........................ 17
    **Section 4.9**    Liability of Members and Managers.................................... 18
    **Section 4.10**    Officers ............................................................................... 19

**ARTICLE 5**
Allocations and Distributions ............................................................................ 21

    **Section 5.1**    Distributions ........................................................................ 21
    **Section 5.2**    Profits, Losses and Distributive Shares of Tax Items.......... 21
    **Section 5.3**    Tax Distributions. ................................................................ 24
    **Section 5.4**    Compliance with Code ........................................................ 24
    **Section 5.5**    Allocations Upon Disposition of Membership Interest ....... 25

Table of Contents
(continued)

Page

**Section 5.6** Basis Adjustment .................................................................................25

**ARTICLE 6**
Dispositions of Membership Interest.................................................................................25

**Section 6.1** Restrictions on Disposition ..........................................................25
**Section 6.2** Death, Disability or Bankruptcy of a Member ..........................26
**Section 6.3** Death or Divorce of Spouse of a Member ................................27
**Section 6.4** Right of First Refusal ...................................................................28
**Section 6.5** Sales Price and Terms of Sale ....................................................29
**Section 6.6** Member Tag-Along Right...........................................................30
**Section 6.7** Member Drag-Along Right..........................................................31
**Section 6.8** New Securities..............................................................................32
**Section 6.9** Assignees ......................................................................................33
**Section 6.10** Additional and Substituted Members .........................................33
**Section 6.11** Repurchase Right .........................................................................34

**ARTICLE 7**
Books and Records; Accounting; Reporting; Tax Elections; Etc..................................34

**Section 7.1** Books and Records ......................................................................34
**Section 7.2** Accounting Basis for Tax Reporting Purposes; Fiscal Year; Tax Matters Partner..................................................................................34
**Section 7.3** Reports ..........................................................................................34
**Section 7.4** Tax Matters Member; Company Representative ........................35

**ARTICLE 8**
Dissolution, Liquidation and Termination of the Company ........................................36

**Section 8.1** Events Requiring Dissolution......................................................36
**Section 8.2** Liquidation; Sale of Substantially all of the Assets..................36
**Section 8.3** Distributions in Kind ...................................................................37
**Section 8.4** Date of Termination.....................................................................37
**Section 8.5** Waiver of Partition .......................................................................37
**Section 8.6** Certificate of Termination ...........................................................38

**ARTICLE 9**
Representations and Warranties of the Members ..........................................................38

**Section 9.1** Acquisition of Interest for Investment .......................................38
**Section 9.2** Access to Information...................................................................38
**Section 9.3** No Registration.............................................................................38
**Section 9.4** No Obligation to Register............................................................38
**Section 9.5** Suitability of Investment..............................................................38
**Section 9.6** No Tax Representations................................................................39

**ARTICLE 10**
Meetings of Members ....................................................................................................39

ii

Table of Contents
(continued)

| | | Page |
|---|---|---|
| Section 10.1 | Place of Meetings | 39 |
| Section 10.2 | Meetings of Members | 39 |
| Section 10.3 | Notice of Meetings of Members | 39 |
| Section 10.4 | Quorum | 39 |
| Section 10.5 | Voting on Matters | 39 |
| Section 10.6 | List of Members Entitled to Vote | 40 |
| Section 10.7 | Registered Members | 40 |
| Section 10.8 | Actions With or Without a Meeting and Telephone Meetings | 40 |

**ARTICLE 11**
Miscellaneous Provisions .................................................................................... 40

| Section 11.1 | Address for Notices | 40 |
| Section 11.2 | Additional Documents and Acts | 41 |
| Section 11.3 | Qualification in Foreign Jurisdictions | 41 |
| Section 11.4 | Application of Delaware Law; Venue | 41 |
| Section 11.5 | Headings and Sections | 41 |
| Section 11.6 | Confidentiality | 41 |
| Section 11.7 | Amendments | 42 |
| Section 11.8 | Numbers and Gender | 42 |
| Section 11.9 | Binding Effect | 42 |
| Section 11.10 | No State-Law Partnership | 43 |
| Section 11.11 | Entire Agreement | 43 |
| Section 11.12 | Severability | 43 |
| Section 11.13 | No Waiver | 43 |
| Section 11.14 | Counterparts | 43 |
| Section 11.15 | Approvals | 43 |
| Section 11.16 | Spouse Acknowledgement | 43 |
| Section 11.17 | Creditors Not Benefited | 44 |
| Section 11.18 | Successors and Assigns | 44 |
| Section 11.19 | Exhibits and Schedules | 44 |

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## COINMINT, LLC

This Limited Liability Company Agreement of Coinmint, LLC dated effective as of the ___ day of November, 2016 (the "Effective Date"), is hereby duly adopted, approved, ratified, and confirmed as the Limited Liability Company Agreement of Coinmint, LLC, a Delaware limited liability company, by the Persons signing this Agreement as the Managers and the Members of the Company.

WHEREAS, the Company was formed on August 22, 2016, as a Delaware limited liability company under and pursuant to the Act;

WHEREAS, in connection with the transactions contemplated by the Purchase Agreement the parties desire to enter into this Agreement to operate the Company as a limited liability company under the Act as more fully set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto intending to be legally bound have entered into this Agreement.

## ARTICLE 1
## Definitions

The definitions used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article 1.

(a)     "**Act**" means the Delaware Limited Liability Company Act, or any successor statute, as amended from time to time.

(b)     "**Additional Capital Contribution**" means any amount contributed or deemed to be contributed to the capital of the Company by the Members pursuant to Section 3.2.

(c)     "**Adjusted Capital Account**" means, with respect to any Member, such Member's Capital Account as of the end of any relevant date after giving effect to the following adjustments:

(1)     Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5); and

(2)     Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of "Adjusted Capital Account" is intended to comply with the provisions of Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be interpreted consistently therewith.

(d)     **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in that Member's Adjusted Capital Account.

(e)     **"Affiliate"** means any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person to whom reference is made.   The term "control" as used herein (including the terms "controlling," "controlled by," and "under common control with") means the possession, directly or indirectly, of the power (a) to vote more than twenty percent (20%) of the outstanding voting securities of or voting interest in a Person, or (b) to direct the management policies of such Person by contract or otherwise.

(f)     **"Agreement"** means this Limited Liability Company Agreement, as amended from time to time.

(g)     **"Approved Sale"** shall have the meaning set forth in Section 6.7(a).

(h)     **"Available Funds"** means Company cash on hand, as of the date of computation, including (without limitation) cash derived from any one or more of the following sources: (a) the Capital Contributions of the Members made pursuant to the terms of this Agreement; (b) the proceeds of any Disposition of all or any portion of the assets of the Company, including, but not limited to, any insurance proceeds; and (c) all Company operating income.

(i)     **"Bankruptcy"** or **"Bankrupt"** with respect to any Person, means that (a) such Person (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for such Person a reorganization, arrangement, composition, readjustment, liquidation, winding up, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of such Person' s or of all or any substantial part of such Person's properties; or (b) against such Person, a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, winding up, dissolution, or similar relief under any law has been commenced and one hundred and twenty (120) days have expired without dismissal thereof or with respect to which, without such Person's consent or acquiescence, a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties has been appointed and one hundred and twenty (120) days have expired without the appointment having been vacated or stayed, or one hundred and twenty (120) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

(j)     **"Board"** means the Board of Managers of the Company as defined in Section 4.1(a).

(k)     **"Book Value"** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except: (a) the initial Book Value of any asset contributed by a Member to the Company shall be the fair market value of such asset, as determined by the

Board; (b) the Book Value of all Company assets shall be adjusted in the event of a revaluation as provided in <u>Section 3.6(d)</u>; (c) the Book Value of any Company asset distributed to any Member shall be the fair market value of such asset on the date of distribution, as determined by the Board; and (d) such Book Value shall be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(l)  "**Breaching Member**" shall have the meaning set forth in <u>Section 6.11</u>.

(m)  "**Business**" means, cryptocurrency and distributed technology infrastructure.

(n)  "**Capital Account**" means with respect to any Member, the account maintained for such Member in a manner which the Board determines is in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

(o)  "**Capital Contributions**" means the total of all capital contributions of the Members pursuant to <u>Sections 3.1</u> and <u>3.2</u>, including, but not limited to, the Initial Capital Contributions and the Additional Capital Contributions.

(p)  "**Certificate of Formation**" means the Certificate of Formation of the Company filed by the Company with the Delaware Secretary of State.

(q)  "**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

(r)  "**Coinmint Trust**" means Coinmint Living Trust.

(s)  "**Coinmint Designee**" shall have the meaning set forth in <u>Section 4.1(b)</u>.

(t)  "**Company**" means Coinmint, LLC, a Delaware limited liability company.

(u)  "**Company Representative**" shall have the meaning set forth in <u>Section 7.4(b)</u>.

(v)  "**Contributing Members**" shall have the meaning set forth in <u>Section 3.2(a)(1)</u>.

(w)  "**Default Contributions**" shall have the meaning set forth in <u>Section 3.2(a)(1)</u>.

(x)  "**Depreciation**" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that (a) with respect to any property the Book Value of which differs from its adjusted tax basis for federal income tax purposes and which difference is being eliminated by use of the remedial allocation method pursuant to Section 1.704-3(d) of the Treasury Regulations, Depreciation for such taxable year or period shall be the amount of book basis recovered for such taxable year or period under the rules prescribed by Section 1.704-3(d)(2) of the Treasury Regulations; and (b) with respect to any other property the Book Value of which differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be adjusted as necessary so as to be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such

beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period is zero, Depreciation for such year or other period shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board.

(y)     **"Disability"** or **"Disabled"** means the inability of a Person to substantially perform normal business activities for a period in excess of ninety (90) days by reason of the mental or physical illness or injury of such Person, in the opinion of an independent physician selected by the Board.

(z)     **"Dispose,"** **"Disposed"** or **"Disposition"** means, with respect to any asset (including, but not limited to, Membership Interests or any portion thereof), a sale, assignment, transfer, conveyance, gift, Encumbrance, hypothecation, exchange, or other disposition of such asset, whether such disposition be voluntary, involuntary or by operation of law, including, but not limited to, the following:  (a) in the case of an asset owned by a natural Person, a transfer of such asset upon the death of its owner, whether by will, intestate succession or otherwise; (b) in the case of an asset owned by an Entity, a change in control of such Entity ("control" being defined as a direct or indirect transfer of twenty percent (20%) or more of the voting securities of such Entity), either due to a merger, consolidation, conversion or any other event or action; and (c) a disposition in connection with, or in lieu of, a foreclosure of an Encumbrance.

(aa)     **"Disposing Member"** shall have the meaning set forth in Section 6.4(a).

(bb)     **"Distributable Cash Flow"** means any Available Funds not required to meet current or anticipated obligations of the Company, as determined by the Board.  In determining what cash is available for distribution, the Board may retain such amounts as the Board in its sole discretion determines will be required to pay the Company's debts, obligations and expenses, and to accomplish the Company's goals and operating results, whether then accrued or anticipated to accrue in the future.

(cc)     **"Dragging Member"** shall have the meaning set forth in Section 6.7(a).

(dd)     **"Effective Date"** shall have the meaning set forth in the preamble to this Agreement.

(ee)     **"Encumbrance"** means any lien, order, security interest, contract, easement, covenant, community property interest, equitable interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

(ff)     **"Entity"** means a Person other than a natural person.

(gg)     **"Failed Contribution"** shall have the meaning set forth in Section 3.2(a)(1).

(hh)     **"Fair Market Value"** shall have the meaning set forth in Section 6.5(a).

(ii)     **"Fiscal Year"** means the fiscal year of the Company as established in Section 7.2.

4

(jj)   **"Indemnified Person"** shall have the meaning set forth in Section 4.8(a).

(kk)   **"Information"** shall have the meaning set forth in Section 11.6.

(ll)   **"Initial Capital Contribution"** means, (a) as to any Member, any amount contributed to the capital of the Company by such Member pursuant to Section 3.1, and (b) with respect to any additional Member, an amount initially contributed to the capital of the Company by such additional Member pursuant to Section 3.2 or Section 6.8.

(mm)   **"Majority"** means, with respect to any referenced group of Members, a combination of such Members who, in the aggregate, own more than fifty percent (50%) of the Sharing Ratios owned by all of the Members included in such referenced group, (ii) with respect to the Managers, more than fifty percent (50%) of the total voting power of the Managers, and (iii) with respect to any other referenced group of Persons, more than fifty percent (50%) of the total number of such Persons.

(nn)   **"Manager"** or **"Managers"** shall have the meaning set forth in Section 4.1(a).

(oo)   **"Member"** means the Persons listed as members on Schedule 1 of this Agreement or any successor or successors to all or part of any such Member's Membership Interest, or any Person admitted as an additional member to the Company in accordance with this Agreement and the Act, each in the capacity as a member of the Company. **"Members"** mean all such Persons collectively in their capacity as members of the Company.

(pp)   **"Member Nonrecourse Debt"** means any nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) of the Company for which any Member bears the economic risk of loss, in accordance with Treasury Regulations Sections 1.704-2(b)(4) and 1.752-2.

(qq)   **"Member Nonrecourse Debt Minimum Gain"** means, for each Member, the amount of Minimum Gain for the Fiscal Year or other period attributable to such Member's "partner nonrecourse debt," determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

(rr)   **"Member Nonrecourse Deductions"** means any Losses or other losses or deductions of the Company that must be allocated to a Member who bears the economic risk of loss for the "partner nonrecourse liability" to which the Losses or other losses or other deductions relate, determined in accordance with Treasury Regulations Section 1.704-2(i)(1).

(ss)   **"Membership Interest"** means all of the rights and obligations of a Member in respect of such Member's ownership interest in the Company, including but not limited to the right to receive distributions and any obligation to make Capital Contributions under this Agreement.

(tt)   **"Minimum Gain"** means, with respect to all nonrecourse liabilities of the Company, the minimum amount of gain that would be realized by the Company if the Company Disposed of the Company property subject to such liability in full satisfaction thereof computed in accordance with Treasury Regulations Section 1.704-2(d).

(uu)   **"Minimum Gain Share"** means, for each Member, such Member's share of Minimum Gain for the Fiscal Year (after taking into account any decrease in Minimum Gain for such year), such share to be determined under Treasury Regulations Section 1.704-2(g).

(vv)   **"Minority Members"** shall have the meaning set forth in Section 6.6(a).

(ww)   **"Mintvest"** means Mintvest Capital Ltd., a Delaware corporation.

(xx)   **"Mintvest Designee"** shall have the meaning set forth in Section 4.1(b).

(yy)   **"New Securities"** means any new securities issued by the Company after the date of this Agreement.

(zz)   **"Notice Date"** shall have the meaning set forth in Section 6.5(a).

(aaa)   **"Non-Contributing Member"** shall have the meaning set forth in Section 3.2(a)(1).

(bbb)   **"Nonrecourse Deductions"** means, for each Fiscal Year or other period, an amount of Company deductions that are characterized as "nonrecourse deductions" under Treasury Regulations Section 1.704-2(c).

(ccc)   **"Offer Notice"** shall have the meaning set forth in Section 6.4(a).

(ddd)   **"Officer"** means a President, any Vice President, a Secretary, a Treasurer and any other duly elected officer elected by the Board under the terms of this Agreement.

(eee)   **"Person"** means an individual, a corporation, a sole proprietorship, a partnership (general or limited) a limited liability company, an association, a trust, a joint venture, or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

(fff)   **"Personal Representative"** shall have the meaning set forth in Section 6.2(a).

(ggg)   **"Profits"** and **"Losses"** means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(2)   Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account

in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(3)     Gain or loss resulting from any Disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property Disposed of, notwithstanding that the adjusted tax basis of such property differs from such Book Value;

(4)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such fiscal year or other period, computed in accordance with the definition of "Depreciation" herein; and

(5)     Notwithstanding any other provision of this definition, any items which are specifically allocated pursuant to Section 5.2(c) shall not be taken into account in computing Profits or Losses.

(hhh)  "**Purchase Agreement**" means that certain Asset Purchase Agreement, dated [_____], by and among the Company and Fortacloud Corporation, a Delaware corporation.

(iii)   "**Purchaser**" shall have the meaning set forth in Section 6.5(a).

(jjj)   "**Regulatory Allocations**" shall have the meaning set forth in Section 5.2(d).

(kkk)  "**Repurchase Notice**" shall have the meaning set forth in Section 6.11.

(lll)   "**Repurchase Option**" shall have the meaning set forth in Section 6.11.

(mmm) "**Restricted Period**" shall have the meaning set forth in Section 3.8(a).

(nnn)  "**Right to Maintain**" shall have the meaning set forth in Section 6.8(a).

(ooo)  "**Securities Act**" means the Securities Act of 1933, as amended.

(ppp)  "**Seller**" shall have the meaning set forth in Section 6.5(a).

(qqq)  "**Selling Member**" shall have the meaning set forth in Section 6.6(a).

(rrr)   "**Sharing Ratio**" means the percentage assigned to such Member in accordance with Section 3.7, as such percentage may change from time to time as provided in this Agreement.

(sss)   "**Spousal Interest**" shall have the meaning set forth in Section 6.3.

(ttt)   "**Super Majority**" means, with respect to any referenced group of Members, a combination of such Members who, in the aggregate, own more than seventy fifty percent (75%) of the Sharing Ratios owned by all of the Members included in such referenced group and, with respect to any other referenced group of Persons, including, but not limited to, the Managers, more than seventy fifty percent (75%) of the total number of such Persons.

(uuu)  "**Tax Distribution**" shall have the meaning set forth in Section 5.4.

(vvv)  "**Tax Matters Member**" shall have the meaning set forth in Section 7.4(a).

(www) "**Treasury Regulations**" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2
## Organization

### Section 2.1    Formation

The Company was formed upon the filing of the Certificate of Formation of the Company on August 22, 2016, pursuant to the Act.

### Section 2.2    Name, Place of Business and Office

The name of the Company is Coinmint, LLC, although such business may be conducted under any other name as may be required by local law or any other name determined by the Board. The Company shall maintain its principal office at the following address: 20 Greenway Plaza, Suite 360, Houston, Texas 77046. The Board may at any time change the location of the Company's office and may establish additional offices, if they deem it advisable. The Board shall promptly give any other Persons written notice of any change in location of the principal office of the Company, to the extent necessary.

### Section 2.3    Registered Office and Registered Agent

The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the initial registered office named in the Certificate or such other office (which need not be a place of business of the Company) as the managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other person or persons as the Managers may designate from time to time in the manner provided by law.

### Section 2.4    Purposes and Character of Business; Powers

(a)    The purposes and character of the business of the Company are to transact any or all lawful business for which limited liability companies may be organized under the Act and which have been approved by the Board.

(b)    The Company shall have any and all powers under the Act which are necessary or desirable to carry out the purposes and business of the Company. The Company shall carry out the foregoing activities pursuant to the arrangements set forth in this Agreement.

### Section 2.5    Term

8

The term of existence of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with either the provisions of this Agreement or the Act.

## ARTICLE 3
## Company Capital

### Section 3.1   Initial Capital Contributions of the Members

(a)   As of the Effective Date, and immediately prior to consummation of the transactions set forth in the Purchase Agreement, each of the Members shall be deemed to have made an Initial Capital Contribution in the amount set forth as the Initial Capital Contribution of such Member opposite its name on Schedule 1 attached hereto and hereby made a part hereof.

(b)   Upon making the Initial Capital Contribution each Member shall receive its Membership Interest and its initial Sharing Ratio as set forth on Schedule 1.

### Section 3.2   Additional Capital Contributions of the Members

(a)   To the extent that there are insufficient Available Funds to cover operating deficits or other capital needs of the Company, the Board shall notify the Members in writing of such deficits or other cash needs.  Such notice shall set forth the total amount of money needed, each Member's share of such amount as calculated under this Section 3.2(a), and the due date thereof, which shall be no earlier than five (5) Business Days and no later than thirty (30) Business Days after the date on which such notice is given.  Each Member shall then be required to make an additional Capital Contribution to the Company by the due date therefor to cover such operating deficits or other cash needs of the Company.  The amount of each Member's required additional Capital Contribution shall be equal to each such Member's pro rata share of the total amount necessary to cover such operating deficits or other cash needs of the Company, determined in accordance with each Member's respective Sharing Ratio.

(1)   If a Member fails to timely make any required additional Capital Contribution under this Section 3.2(a) ("Failed Contribution"), then (A) that Member shall be treated as a non-contributing Member (the "Non-Contributing Member") under this provision, and (B) the Board may, in its sole discretion, solicit and accept additional Capital Contributions from the Members, other than the Non-Contributing Member (collectively, the "Contributing Members"), in an amount up to the Non Contributing Members' aggregate Failed Contributions (collectively, "Default Contributions").

(2)   Immediately following such Failed Contribution, effective as of the date the amount requested under this Section 3.2(a) was due, each Member's Sharing Ratio will be adjusted to reflect the Capital Contributions made by such Member, including any Default Contributions, as applicable, divided by the aggregate Capital Contributions made by all Members, including any Default Contribution made by a Contributing Member pursuant to this Section 3.2(a).  Any such adjustments of Sharing Ratios shall be made by the Board in good faith.  The Board may, without the consent of any other Member, amend Schedule 1 hereto to reflect any adjustments in Sharing Ratios

9

permissible under applicable statutes and rules of procedure, a temporary injunction may be granted immediately upon the commencement of any such suit. Nothing contained in this Agreement shall be construed as prohibiting the Company or any other Member from pursuing other remedies available at law or equity for such breach or threatened breach of this Section 3.8.

(d)     Notwithstanding the restrictions contained in Section 3.8(a), a Member may own an aggregate of not more than two percent (2%) of the outstanding stock, partnership units or other securities of any entity engaged in any Business, if such stock, partnership units or other securities is or are listed on any securities exchange or regularly traded in the over-the-counter market by a member of a securities exchange, without violating the provisions of Section 3.8(a); provided that such Member does not have the power, directly or indirectly, to control or direct the management or affairs of any such entity and is not involved in the management of such entity.

(e)     Except as provided above in Sections 3.8(a), (b) and (c), and except for any applicable restrictions in any employment agreement between the Company and any Member, each Member, in its individual capacity or otherwise, and its respective principals and Affiliates, shall be free to engage and conduct or participate in any business or activity whatsoever, including, without limitation, the business conducted by the Company, without any accountability or obligation whatsoever to the Company or to any other Member and each Member waives any right or claim it may have against any Member with respect to any competing business or activity or the income or profits therefrom.

### Section 3.9    Lack of Authority

No Member in its capacity as such has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to incur any expenditures on behalf of the Company.

## ARTICLE 4
## Board of Managers

### Section 4.1    Number and Qualifications

(a)     Subject to any approval rights contained herein or in the Act, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of managers, who shall be referred to herein each as a "Manager" or collectively as the "Managers", and who shall act as a board (when acting as a board, the Managers are referred to herein as the "Board"). The Managers need not be Members or residents of the State of Delaware.

(b)     Form and after the Effective Date, the Board shall be composed of two (2) individuals. Coinmint Trust shall designate one (1) Manager to the Board (such designee, the "Coinmint Designee") and the initial Coinmint Designee shall be Coinmint Trust. Mintvest shall designate one (1) Manager to the Board (such designee, the "Mintvest Designee") and the initial Mintvest Designee shall be Prieur Leary. The Managers,

14

acting by Majority vote, shall select one Manager to serve as the Chairman of the Board. The Chairman of the Board shall preside at meetings and generally manage the affairs of the Board. Commencing on the Effective Date, the Board shall be composed of such designees, each of whom shall serve until his successor is duly selected in accordance with this Agreement and qualified or until such individual's death, resignation or removal.

## Section 4.2    Removal of Managers; Vacancies

(a)    Any Manager may be removed from the Board, with or without cause, only by the Member who designated such Manager to serve on the Board. If a vacancy is created on the Board at any time by the death, Disability, retirement, resignation or removal of a Manager, the Member that had designated such Manager to serve on the Board shall have the sole and exclusive right to designate a replacement therefor; provided, that if such vacancy is the result of a newly created position or as a result of the death, Disability, retirement, resignation or removal of a Manager who has not been designated by a specific Member, then such Manager position shall be filled by the Members and the Board.

## Section 4.3    Meetings of Board; Quorum; Voting

(a)    All meetings of the Board may be held either within or without the State of Delaware.  The Company shall pay the Managers' reasonable expenses incurred in connection with attending any meeting of the Board.

(b)    Regular meetings of the Board may be called on fourteen (14) days' personal or written notice (effective upon receipt) to each other Manager.  Except as otherwise provided by statute, the Certificate of Formation or this Agreement, any and all business may be transacted at any regular meeting.  Notwithstanding the foregoing, the Board shall at a minimum hold one regular meetings within seven (7) days of the end of each quarter, without notice and at such time and place either within or without the State of Delaware, as shall from time to time be determined by the Board.

(c)    Special meetings of the Board may be called at any time by any Manager with at least forty-eight (48) hours personal or written notice to each other Manager; *provided, however*, that in the event of exigent circumstances as determined by any Manager, notice of less than forty-eight (48) hours may be given.  Any notice required pursuant to this Section 4.3 need not state the purpose or purposes of such meeting.

(d)    At all meetings of the Board the presence or representation of a majority of the number of Managers fixed by or in the manner provided in this Agreement shall be necessary and sufficient to constitute a quorum for the transaction of business, except to the extent a greater number is otherwise required by statute, the Certificate of Formation or this Agreement.  If a quorum is not present at any meeting of the Board, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  At any such adjourned

15

meeting any business may be transacted that might have been transacted at the meeting as originally convened.

(e)     Each Manager shall have the voting power equivalent to the Sharing Ratio of the Member that appointed such Manager and, unless otherwise expressly stated in this Agreement, all actions by or requiring the consent or approval of the Board shall require the consent or approval of a Majority of the Board.

(f)     For all purposes hereunder, any Board action shall require the approval of a Majority of the Managers then serving on the Board.

## Section 4.4    Actions With or Without a Meeting and Telephone Meetings

Notwithstanding any provision contained in this Agreement, all actions of the Board provided for herein shall be taken either at a meeting and evidenced by written minutes thereof executed by one or more Manager or by written consent without a meeting. Any meeting of the Board may be held by means of a telephone conference by means of which all Persons participating in the meeting can hear or otherwise communicate with each other, and participation in such a meeting shall constitute presence in person at such meeting. At any regular or special meeting of the Board, the Company shall make provisions for any Manager who desires to attend such meeting via teleconference. Any action which may be taken by the Board without a meeting shall be effective only if the written consent (or consents) sets forth the action so taken, and is signed by the number of Managers constituting not less than the minimum number of Managers that would be necessary to take such action if all of the Managers entitled to vote on the action were present and voted thereon.

## Section 4.5    Restrictions on the Powers of Managers Acting Individually

Notwithstanding anything to the contrary contained in this Article 4, if more than one Person has been appointed as Manager, a Manager shall not have any power or authority to act individually on behalf of the Company except for such power or authority as may be specifically conferred upon such Manager by this Agreement or by action of the Board.

## Section 4.6    Actions of the Board Requiring Consent of a Majority of the Members

Notwithstanding anything to the contrary contained in this Agreement, without the consent of a Majority of the Members, neither the Board nor any Manager or Officer shall have the power or authority:

(a)     To dissolve the Company;

(b)     To Dispose of all or substantially all of the assets of the Company;

(c)     To effect a merger or plan of exchange of the Company with any Entity which would result in the Members not owning, directly or indirectly, greater than fifty percent (50%) of the outstanding voting equity interests of the surviving Entity;

(d)     To file Bankruptcy on behalf of the Company; or

16

(e)     To do any act in contravention of this Agreement.

**Section 4.7      Transactions with Related Parties**

The Board may agree, contract, or arrange with any Manager, Member or Officer or any Affiliate of any Manager, Member or Officer in the name and on behalf of the Company, for any Company purpose, provided that the terms and provisions of any such agreement, contract or arrangement shall be comparable to those available from third parties.

**Section 4.8      Indemnification of the Board and Officers.**

(a)     The Company shall indemnify the Managers and Officers (each an "Indemnified Person" and collectively, the "Indemnified Persons") to the fullest extent permitted under the Act from and against any and all losses, claims, damages, liabilities, joint or several, expenses (including reasonable legal fees and expenses), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, that relate to the operations of the Company as set forth in this Agreement in which an Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, REGARDLESS OF WHETHER ARISING FROM ANY ACT OR OMISSION WHICH CONSTITUTED THE SOLE, PARTIAL OR CONCURRENT NEGLIGENCE (WHETHER ACTIVE OR PASSIVE) OF SUCH INDEMNIFIED PERSON, if (1) such Indemnified Person acted in good faith in a manner he or she reasonably believed to be in, or not opposed to, the interests of the Company, (2) the conduct of such Indemnified Person did not constitute actual fraud, gross negligence, bad faith or willful misconduct, and (3) in the case of any criminal proceeding, such Manager or Officer did not have reasonable cause to believe that the act or omission was unlawful. The termination of any proceeding by judgment, order or settlement does not create a presumption that an Indemnified Person did not meet the requisite standard of conduct set forth in this Section 4.8(a). The termination of any proceeding by conviction or upon a plea of nolo contendere or its equivalent, or an entry of an order of probation prior to judgment, creates a rebuttable presumption that an Indemnified Person acted in a manner contrary to that specified in this Section 4.8(a). Any indemnification pursuant to this Section 4.8 shall be made only out of the assets of the Company, including insurance proceeds, if any.

(b)     The Company shall reimburse an Indemnified Person on a monthly basis for reasonable expenses incurred by such Indemnified Person who is a party to a proceeding in advance of the final disposition of the proceeding upon receipt by the Company of a written affirmation by such Indemnified Person of such Indemnified Person's good faith belief that the standard of conduct necessary for indemnification by the Company as authorized in this Section 4.8 has been met; provided that such Indemnified Person shall be required to pay to the Company all amounts which have been reimbursed to such Indemnified Person by the Company in the event such Indemnified Person has been determined by a court of competent jurisdiction to not be entitled to indemnification under Section 4.8(a) above.

(c)     The indemnification provided by this <u>Section 4.8</u> shall be in addition to any other rights to which the Indemnified Persons may be entitled under any agreement, as a matter of law or otherwise.

(d)     The Company may purchase and maintain such insurance on behalf of an Indemnified Person or an employee of the Company, as the Board shall determine, against any liability that may be asserted against or expenses that may be incurred by an Indemnified Person or an employee in connection with the Company's activities, regardless of whether the Company would have the power to indemnify the Indemnified Person or employee against such liability under the provisions of this Agreement.

(e)     In no event may any Indemnified Person subject the Members to personal liability by reason of the indemnification provisions set forth in this Agreement.

(f)     No Indemnified Person shall be denied indemnification in whole or in part under this <u>Section 4.8</u> because such Indemnified Person or any Affiliate of such Indemnified Person had an interest in the transaction with respect to which the indemnification applies, if the transaction was otherwise permitted by the terms of this Agreement.

(g)     The provisions of this <u>Section 4.8</u> are for the benefit of the Indemnified Persons and their respective successors and assigns, and shall not be deemed to create any rights for the benefit of any other Persons.

(h)     Any amendment, modification or repeal of this <u>Section 4.8</u> or any provision in this <u>Section 4.8</u> shall be prospective only and shall not in any way affect the rights of any Indemnified Person under this <u>Section 4.8</u> as in effect immediately prior to such amendment, modification or repeal with respect to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when claims relating to such matters may arise or be asserted.

**Section 4.9     <u>Liability of Members and Managers</u>**

(a)     It is the intent of this <u>Section 4.9</u> to restrict the liability and fiduciary duties of the Members and the Managers to the maximum extent permitted by applicable law. Neither the Company nor any Member or Manager shall have any claim against any Member or Manager by reason of any act or omission of such Member or Manager, provided that such act or omission was performed by the Member or Manager within the scope of its authority under this Agreement and that such act or omission did not involve the Member's or Manager's bad faith, gross negligence, willful misconduct or actual fraud, REGARDLESS OF WHETHER SUCH ACT OR OMISSION CONSTITUTED THE SOLE, PARTIAL OR CONCURRENT NEGLIGENCE (WHETHER ACTIVE OR PASSIVE) OF THE MEMBER OR MANAGER. Notwithstanding the above, a Member or Manager shall have no liability hereunder for failing to act if such act required the consent of some or all of the Managers or Members and the required consent to such action was not granted. Any amendment, modification or repeal of this <u>Section 4.9</u> or any provision in this <u>Section 4.9</u> shall be prospective only and shall not in any way affect

the limitations on any Member's or Manager's liability to the Company and the Members and Managers under this Section 4.9 as in effect immediately prior to such amendment, modification or repeal with respect to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when claims relating to such matters may arise or be asserted.

(b)     In furtherance of this limitation of fiduciary duties of the Members and Managers, but not by way of limitation, the following provisions shall apply:

(1)     it will not constitute a breach of fiduciary or other duty for a Member or Manager or any of their respective Affiliates to engage in any business activity, including, without limitation, activities of the type conducted by the Company, even if in direct competition with the Company;

(2)     it will not constitute a breach of fiduciary or other duty for Members or Managers to resolve any conflicts of interest in accordance with the terms of this Agreement or an agreement with the other Members or Managers;

(3)     it will not constitute a breach of fiduciary or other duty for the Members or Managers to engage attorneys, accountants and other advisors on behalf of the Company even though such Persons may also be retained from time to time by a Member or Manager or any of a Member's or Manager's officers, directors, shareholders, members or partners, and such Persons may be engaged with respect to any matter in which the interest of the Company and a Member or Manager may differ, or may be engaged by both the Company and a Member or Manager with respect to any other matter.  No Members or Managers shall be responsible for any misconduct or negligence on the part of any such attorney, accountant or other advisor; and

(4)     it will not constitute a breach of fiduciary or other duty for a Member or Manager to contract or enter into any agreement or arrangement with the Company with respect to any Company property or any aspect of the operations of the Company so long as the terms and provisions of any such agreement or arrangement are arms' length.

**Section 4.10   Officers**

(a)     Number.  The principal Officers of the Company, if any, may consist of a President, one or more Vice Presidents, a Secretary, a Treasurer, and such other Officers and assistant Officers and agents as may be deemed necessary and elected or appointed by the Board, at such time and in such manner and for such terms as the Board may prescribe.  Any two or more offices may be held by the same Person.

(b)     General Duties.  All Officers and agents of the Company, as between themselves and the Company, shall have such authority, perform such duties and manage the Company as may be provided in this Agreement or as may be determined by the Board.

(c)     Election, Term of Office and Qualifications. The Officers shall be chosen by the Board. Each Officer shall hold office until a successor is chosen and qualified or until the death, resignation, or removal of such Officer. The initial officers of the Company are set forth on Schedule 2, attached hereto and hereby made a part hereof

(d)     Removal. Any Officer or agent elected or appointed by the Board may be removed (with or without cause) by the Board.

(e)     Vacancies. Any vacancy in any office because of death, resignation, removal or any other cause shall be filled for the unexpired portion of the term in the manner prescribed in this Agreement for election or appointment to such office.

(f)     Resignation. Any Officer may resign at any time by giving written notice to the Board. Such resignation shall take effect at the time specified in the notice, and, unless otherwise specified in the notice, the acceptance of such resignation shall not be necessary to make it effective. Such resignation shall be without prejudice to the contract rights, if any, of the Company.

(g)     The President. The President shall have active management of the operations of the Company, subject, however, to the control of the Board. The President shall, in general, perform all duties incident to the office of President and such other duties as from time to time may be assigned by the Board.

(h)     The Vice Presidents. Each Vice President shall have such powers and perform such duties as the Board may from time to time prescribe or as the President may from time to time delegate to such officer. At the request of the President, any Vice President may temporarily act in place of the President. In the case of the death, absence, or inability to act of the President, the Board may designate any Vice President to perform the duties of the President. The Board may appoint different types of vice presidents with different day-to-day management responsibilities over the operations of the Company, including, but not limited, to the power to employ persons to accomplish the purposes of the Company.

(i)     The Secretary. The Secretary shall keep, or cause to be kept, in books provided for that purpose, minutes of the meetings of, or actions taken by, the Board and the Members; shall see that all notices are duly given in accordance with the provisions of this Agreement and as required by applicable law; shall be custodian of the records; and, in general, shall perform all duties incident to the office of the Secretary and such other duties as may from time to time be assigned by the Board or the President.

(j)     The Treasurer. The Treasurer shall be the principal financial officer of the Company; shall have charge and custody of and be responsible for all funds of the Company and shall deposit all such funds in the name of the Company in such banks, trust companies or other depositories as shall be selected by the Board; shall receive and give receipts for moneys due and payable to the Company from any source; and, in general, shall perform all the duties incident to the office of the Treasurer and such other duties as from time to time may be assigned by the Board or the President. The Treasurer

shall render to the Board, whenever the same shall be required, an account of all transactions accomplished as the Treasurer and of the financial condition of the Company. The Treasurer shall, if required to do so by the Board, give the Company a bond in such amount and with such surety or sureties as may be ordered by the Board, for the faithful performance of the duties of office and for the restoration to the Company, in the case of death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind belonging to the Company which are held or controlled by the Treasurer.

(k)     Indemnification. The Officers shall be indemnified by the Company to the extent and in the manner described in Section 4.8.

## ARTICLE 5
## Allocations and Distributions

### Section 5.1     Distributions

Except as otherwise provided in Section 5.4 regarding Tax Distributions and Section 8.2 regarding liquidation proceeds, Distributable Cash Flow shall be distributed to the Members at such time and in such amounts as the Board shall determine, pro rata, in accordance with the Members' respective Sharing Ratios, determined as of the date of distribution.

### Section 5.2     Profits, Losses and Distributive Shares of Tax Items

(a)     Profits. Except as provided in Section 5.2(c), Profits for any Fiscal Year will be allocated to the Members in proportion to their respective Sharing Ratios.

(b)     Losses. Except as provided in Section 5.2(c), Losses for any Fiscal Year will be allocated to the Members in proportion to their respective Sharing Ratios.

(c)     Special Allocations. Except as otherwise provided in this Agreement, the following special allocations will be made in the following order and priority:

(1)     Company Minimum Gain Chargeback. Notwithstanding any other provision of this Section 5.2, if there is a net decrease in Company Minimum Gain during any taxable year or other period for which allocations are made, the Members will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods). The amount allocated to each Member under this Section 5.2(c)(1) shall be an amount equal to the total net decrease in the Member's Minimum Gain Share at the end of the immediately preceding taxable year. The items to be allocated will be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section 5.2(c)(1) is intended to comply with the "partnership minimum gain chargeback" requirements of the Treasury Regulations and the exceptions thereto and will be interpreted consistently therewith.

(2)     Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 5.2 (other than Section 5.2(c)(1) which shall be applied first), if there is a net decrease in Member Nonrecourse Debt

Minimum Gain during any taxable year or other period for which allocations are made, any Member with a share of such Member Nonrecourse Debt Minimum Gain attributable to any Member Nonrecourse Debt (determined under Treasury Regulations Section 1.704-(2)(i)(5)) as of the beginning of the year shall be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in proportion to the portion of such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain with respect to such Member Nonrecourse Debt that is allocable to the Disposition of Company property subject to such Member Nonrecourse Debt. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g). This Section 5.2(c)(2) is intended to comply with the "partner minimum gain chargeback" requirements of the Treasury Regulations and the exceptions thereto and shall be interpreted consistently therewith.

(3) **Qualified Income Offset.** A Member who unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible.

(4) **Nonrecourse Deductions.** Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated among the Members in proportion to their respective Sharing Ratios in the Company.

(5) **Member Nonrecourse Deductions.** Notwithstanding anything to the contrary in this Agreement, any Member Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(6) **Code Section 754 Adjustments.** To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(7) **Depreciation Recapture.** In the event there is any recapture of Depreciation or investment tax credit, the allocation of gain or income attributable to such recapture shall be shared by the Members in the same proportion as the deduction for such Depreciation or investment tax credit was shared.

(8)    **Reallocation**.  To the extent Losses allocated to a Member would cause such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year, the Losses will be reallocated to other Members.  If any Member receives an allocation of Losses otherwise allocable to another Member in accordance with this Section 5.2(c)(8), such Member shall be allocated Profits in subsequent Fiscal Years necessary to reverse the effect of such allocation of Losses.  Such allocation of Profits (if any) shall be made before any allocations under Section 5.2(a) but after any other allocations under Section 5.2(c).

(9)    **Interest in Company.**  Notwithstanding any other provision of this Agreement, no allocation of Profit or Loss or item of Profit or Loss will be made to a Member if the allocation would not have "economic effect" under Treasury Regulations Section 1.704-1(b)(2)(ii) or otherwise would not be in accordance with the Member's interest in the Company within the meaning of Treasury Regulations Section 1.704-1(b)(3) or 1.704-1(b)(4)(iv).  The Board will have the authority to reallocate any item in accordance with this Section 5.2(c)(9).

(d)    **Curative Allocations**.  The allocations set forth in Section 5.2(c)(1) through (9) (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations Section 1.704-1(b) and 1.704-2.  The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Company distributions.  Accordingly, the Board is authorized to further allocate Profits, Losses, and other items among the Members so as to prevent the Regulatory Allocations from distorting the manner in which Company distributions would be divided among the Members under Sections 5.1 and 8.2 but for application of the Regulatory Allocations.  In general, the reallocation will be accomplished by specially allocating other Profits, Losses and items of income, gain, loss and deduction, to the extent they exist, among the Members so that the net amount of the Regulatory Allocations and the special allocations to each Member is zero.  The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

(e)    **Tax Allocations--Code Section 704(c).**  In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Book Value.  In making such allocations, the Board shall use the remedial allocation method permitted under Treasury Regulations Section 1.704-3(d).  If the Book Value of any Company asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to that asset will take into account any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Treasury Regulations.  Any elections or other decisions relating to allocations under this Section 5.3 will be made in any manner that the Board determines reasonably reflects the purpose and intention of this Agreement.  Allocations under this Section 5.3 are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into

23

account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions under any provision of this Agreement.

    (f)    **Other Allocation Rules.**  The following rules will apply to the calculation and allocation of Profits, Losses and other items:

        (1)    Except as otherwise provided in this Agreement, all Profits, Losses and other items allocated to the Members will be allocated among them in proportion to their Sharing Ratios.

        (2)    For purposes of determining the Profits, Losses or any other item allocable to any period, Profits, Losses and other items will be determined on a daily, monthly or other basis, as determined by the Board using any permissible method under Code Section 706 and the related Treasury Regulations.

        (3)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, credit and other allocations not provided for in this Agreement will be divided among the Members in the same proportions as they share Profits and Losses.

    (g)    **Member Acknowledgment.**  The Members agree to be bound by the provisions of this <u>Section 5.3</u> in reporting their shares of Company income and loss for income tax purposes.

### Section 5.3    <u>Tax Distributions.</u>

Notwithstanding the foregoing distribution provisions of <u>Section 5.1</u>, each Member shall be entitled to receive cumulative cash distributions in an amount sufficient to enable such Member to discharge its cumulative U.S. federal tax liability (excluding interest and penalties) arising as a result of such Member's interest in the Company, determined by assuming the applicability to such Member of the highest combined effective marginal U.S. federal income tax rate applicable to individuals at the time of such distributions. In furtherance of the foregoing, to the extent the cumulative distributions otherwise paid or payable to a Member pursuant to <u>Section 5.1</u> are insufficient to cover such tax liabilities, the Board shall make cash distributions (the "<u>Tax Distributions</u>") in amounts that, when added to the cumulative cash distributions otherwise paid or payable, shall equal such tax liability. The amount of such tax liability shall be calculated taking into account (a) all cumulative Profits, income and gain allocated to such Member under this Agreement, including Profits, income and gain allocated in prior Fiscal Years, (b) the deductibility (to the extent allowed) of state and local income taxes for United States federal income tax purposes, (c) all cumulative Losses, deductions or other losses allocated to such Member under this Agreement , including Losses, deductions or other losses allocated in prior Fiscal Years, and (d) the character of the Profits, income, credit, loss, or deductions, allocated or previously allocated to such Member. Tax Distributions made to a Member pursuant to this <u>Section 5.4</u> shall be debited against such Member's Capital Account and shall be treated as an advance distribution that will reduce on a dollar-for-dollar basis the amount of later distributions to such Member pursuant to <u>Section 5.1</u> or <u>Section 8.2(b)</u>.

### Section 5.4    <u>Compliance with Code</u>

The foregoing provisions of this Article 5 relating to the allocation of Profits, Losses and other items for federal income tax purposes are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Treasury Regulations. Notwithstanding anything to the contrary, nothing in this Article 5 shall apply if it lacks "economic effect."

### Section 5.5    Allocations Upon Disposition of Membership Interest

Profits or Losses attributable to any Membership Interest which has been Disposed of during any Fiscal Year shall be allocated between the transferor and the transferee as follows:

(a)    For the days in such Fiscal Year prior to and including the date of the Disposition, to the transferor.

(b)    For the days in such Fiscal Year subsequent to the date of the Disposition, to the transferee.

### Section 5.6    Basis Adjustment

Upon the Disposition of all or part of an interest in the Company, at the request of the transferee of the interest, the Board may (but shall not be obligated to) cause the Company to elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's assets as provided in Sections 734 and 743 of the Code. Any Person requesting any tax election under this Section 5.7 shall pay any accounting fees and expenses related to such election.

### ARTICLE 6
### Dispositions of Membership Interest

### Section 6.1    Restrictions on Disposition

(a)    Except upon the approval of the Board or as expressly permitted herein, no Member may Dispose of all or any part of its Membership Interest or any beneficial right or interest therein, or contract to do or permit any of the foregoing, whether voluntarily or by operation of law, and any attempt to do so shall be void.

(b)    Notwithstanding anything to the contrary contained herein, unless the Board consents, no Member may Dispose of all or any portion of its Membership Interest if such Disposition:

(1)    when added to the total of all other Dispositions of Membership Interests within the preceding twelve (12) months, would result in the Company being considered to have terminated within the meaning of Code Section 708; or

(2)    would otherwise cause the Company to lose its status as a partnership for federal income tax purposes.

(c)    Notwithstanding anything to the contrary contained herein, no Member may Dispose of all or any portion of its Membership Interest if such Disposition would

25

violate any federal securities laws or any applicable state securities laws (including suitability standards).

(d)     In order to effectuate the purpose of this Section 6.1, each Member agrees that, unless otherwise specifically permitted in this Article 6, to the extent its interest in the Company is at any time held by an Entity, such Member will seek to Dispose of such interest only through a direct Disposition of such interest in the manner contemplated in this Section 6.1, and that no Disposition, to a single transferee or related group of transferees, of more than twenty percent (20%) of the stock, partnership interest, membership interest or other voting securities or beneficial interest in any such Entity which holds an interest in the Company will be effected, directly or indirectly, unless approved by the Board.

### Section 6.2     Death, Disability or Bankruptcy of a Member

(a)     Upon the death, Disability or Bankruptcy of a Member, the personal representative of the estate of the deceased, Disabled or Bankrupt Member (the "Personal Representative") shall be required to offer in a written instrument to sell all of the Membership Interest of the deceased, Disabled or Bankrupt Member to the Company and the Members (other than a Member that is the deceased, Disabled or Bankrupt Member) for the price and on the terms and conditions specified in Section 6.5. The Company shall have the first right for ten (10) days after it receives notification from the Personal Representative to elect to purchase such Membership Interest. In the event the Company declines to purchase such Membership Interest of the deceased, Disabled or Bankrupt Member, such Membership Interest may be purchased by the Members (other than a Member that is the deceased, Disabled or Bankrupt Member). The Members (other than a Member that is the deceased, Disabled or Bankrupt Member) shall have thirty (30) days after actual receipt of such notification that the Company declined to purchase such Membership Interest within which to advise the Personal Representative whether such Members will so purchase such Membership Interest of the deceased, Disabled or Bankrupt Member and the Personal Representative shall sell such Membership Interest to such Members. Each such Member (other than a Member that is the deceased, Disabled or Bankrupt Member) shall have the right to purchase such portion of the Membership Interest offered for sale as the Sharing Ratio owned by such Member at such time shall bear to the total Sharing Ratios owned by all of the Members, excluding the deceased, Disabled or Bankrupt Member. If any Member (other than a Member that is the deceased, Disabled or Bankrupt Member) does not elect to purchase its full portion of such Membership Interest, the remaining Membership Interest may be purchased by the other Members (other than a Member that is the deceased, Disabled or Bankrupt Member), pro rata, in the same manner. In the event that the Company and the Members (other than a Member that is the deceased, Disabled or Bankrupt Member) do not elect to purchase all of such Membership Interest of the deceased, Disabled or Bankrupt Member, the Personal Representative may proceed to distribute such deceased, Disabled or Bankrupt Member's Membership Interest to the successors in interest entitled to receive the same as a result of the Member's death, Disability or Bankruptcy and to the surviving spouse of such deceased Member to the extent of the community property interest in the Membership Interest of such surviving spouse. Any such successor to the deceased,

Disabled or Bankrupt Member's Membership Interest or surviving spouse shall thereupon (by written supplement to this Agreement) become a party to this Agreement and shall hold all of the Membership Interest transferred to such Person subject in all respects to the terms and provisions hereof.

(b)     Notwithstanding anything to the contrary in <u>Section 6.2(a)</u>, if the dead, Disabled or Bankrupt Member is married to a Member, then the Personal Representative of such dead, Disabled or Bankrupt Member shall first offer to sell the Membership Interest to the dead, Disabled or Bankrupt Member's spouse for the price and on the terms and conditions specified in <u>Section 6.5</u> prior to offering the Membership Interest to the Company pursuant to <u>Section 6.2(a)</u>. The spouse of the dead, Disabled or Bankrupt Member shall have ten (10) days after it receives such offer from the Personal Representative to elect to purchase such Membership Interest.

### Section 6.3     Death or Divorce of Spouse of a Member

In the event of the death of any spouse of a Member who is an individual, or in the event of the divorce of a Member who is an individual and any spouse of such Member, the Member whose spouse either died or was divorced shall have the right and option to acquire any and all community property interest of the divorced or deceased spouse in the Member's Membership Interest (the "<u>Spousal Interest</u>") from the divorced spouse or from the estate of the deceased spouse upon the terms and conditions and for the price specified in <u>Section 6.5</u>. Such option may be exercised by the Member by giving written notice to the divorced spouse or the personal representative of the estate of the deceased spouse within one hundred twenty (120) days after such death or divorce. If such Member fails to exercise such option to purchase the entire Spousal Interest of the divorced spouse or deceased spouse's estate, the divorced spouse or the personal representative of the estate of the deceased spouse shall offer to sell any remaining portion of such Spousal Interest to the Company and the Members upon the terms and at the price specified in <u>Section 6.5</u>. The Company shall have ten (10) days after actual receipt of such offer within which to advise the divorced spouse or the personal representative of the estate of the deceased spouse whether the Company will so purchase such remaining portion of such Spousal Interest. If the Company fails to exercise its option to purchase the full portion of such remaining portion of such Spousal Interest, then the divorced spouse or the personal representative of the estate of the deceased spouse shall irrevocably offer in a written instrument to sell the remaining portion of such Spousal Interest to the Members upon the terms and conditions and for the price specified in <u>Section 6.5</u>. The Members shall have thirty (30) days after actual receipt of such notice within which to advise the divorced spouse or the personal representative of the estate of the deceased spouse whether such Members will so purchase such remaining portion of such Spousal Interest. Each such other Member shall have the right to purchase such portion of the remaining portion of such Spousal Interest offered for sale as the Sharing Ratio owned by such Member at such time shall bear to the total Sharing Ratios owned by all the Members, excluding the divorced or surviving Member. If any Member does not elect to purchase its full portion of such remaining portion of such Spousal Interest, the remaining Spousal Interest may be purchased by the other Members, pro rata, in the same manner. If the other Members decline to purchase all of the remaining portion of such Spousal Interest in accordance with this <u>Section 6.3</u>, the option to purchase such remaining portion of such Spousal Interest shall terminate and the remaining portion of such Spousal Interest shall be held by the

divorced spouse or estate, heirs or legatees of the deceased spouse but subsequently shall be offered for sale at the times and on the terms and conditions set forth in this Agreement as if such Spousal Interest were still wholly owned by the Member.  However, in the event of the subsequent sale of the Membership Interest to which the Spousal Interest relates pursuant to another provision of this Article 6, the Member or the personal representative of the Member's estate shall pay the divorced spouse or the estate of such deceased spouse the appropriate portion of the sale proceeds of any such Membership Interest owned by such spouse or estate; but the purchaser of such Membership Interest hereunder shall not be obligated to verify or assure payment to such spouse or estate and shall be protected by making payments to the registered owner of such Membership Interest.  Any successor to all or any portion of a Spousal Interest described in this Section 6.3 shall, upon receipt of such Spousal Interest, execute a written supplement to this Agreement and become a party to this Agreement and shall hold all of the Spousal Interest transferred to such successor subject in all respects to the terms and provisions hereof.  Nothing contained in this Section 6.3 shall create any community property rights in any spouse of any Member and no such rights shall be inferred due to the provisions of this Section 6.3.

**Section 6.4**     **Right of First Refusal.**

(a)     Except for as otherwise provided in Section 6.4(b), a Member ("Disposing Member") who receives a bona fide offer from a third party and desires to Dispose of some or all of its Membership Interest to such third party shall first offer to sell to the Company and the Members (other than the Member who is the Disposing Member) all of the Membership Interest which such Disposing Member proposes to Dispose of to such third party.  Such offer shall be made by an irrevocable written offer ("Offer Notice") to the Company and the Members, other than the Disposing Member, to Dispose of all, but not less than all, of the Membership Interest which the Disposing Member proposes to Dispose of for the same price and on the same terms which the Disposing Member proposes to Dispose of such Membership Interest.  Such offer shall also contain a complete description of any transaction in which the Disposing Member proposes to Dispose of such Membership Interest to any third party, including the name of the proposed transferee and the consideration for and other terms of the proposed Disposition.  If the consideration for such Disposition described in the offer is not cash or publicly traded securities, the offer shall state the value of such consideration.  The Company shall have the first right for ten (10) days after it receives notification from the Disposing Member to purchase the Membership Interest of the Disposing Member.  In the event the Company declines to purchase the Membership Interest of the Disposing Member, such Membership Interest may be purchased by the Members (other than a Member who is the Disposing Member).  The Members (other than a Member who is the Disposing Member) shall have thirty (30) days after actual receipt of notification that the Company declined to purchase such Membership Interest within which to advise the Disposing Member whether or not such Members will purchase such Membership Interest.  Each such Member (except a Member who is the Disposing Member) shall have the right to purchase such portion of the Membership Interest offered for sale as the Sharing Ratio owned by such Member at such time shall bear to the total Sharing Ratios owned by all the Members, excluding the Disposing Member.  If any Member (other than a Member who is the Disposing Member) does not elect to purchase its full portion of

such Membership Interest offered for sale, the remaining Membership Interest may be purchased by the other Members (other than a Member who is the Disposing Member), pro rata, in the same manner. If the Company and the Members decline to purchase all of the Disposing Member's Membership Interest which has been offered pursuant to the Offer Notice in accordance with this Section 6.4, and the Board consents, which consent shall not be unreasonably withheld, the Disposing Member shall then have sixty (60) days within which to Dispose of such Membership Interest to the third party named in the Offer Notice, upon the terms described in such Offer Notice. Any Disposition of a Membership Interest to a third party shall be subject to all of the terms and provisions of this Agreement, including, but not limited to, Sections 6.5 and 6.9. The third party transferee shall then execute a written supplement to this Agreement and shall be bound by all of the terms and provisions of this Agreement.

(b)       Notwithstanding anything to the contrary in Section 6.4(a), if the Disposing Member is married to a Member, then the Disposing Partner shall first offer to sell its Membership Interest to his or her spouse for the price and on the terms and conditions specified in Section 6.4(a) prior to offering the Membership Interest to the Company pursuant to Section 6.4(a). The spouse of the Disposing Member shall have ten (10) days after it receives such offer from the Disposing Member to elect to purchase such Membership Interest.

## Section 6.5    Sales Price and Terms of Sale

(a)       The sales price of each Membership Interest (or interest therein) to be sold for the price specified in this Section 6.5 shall be the Fair Market Value (as hereinafter defined) of such Membership Interest (or interest therein). For purposes of this Section 6.5, "Fair Market Value" shall mean the amount of cash and fair market value of property which would be received by the holder of the Membership Interest (or interest therein) to be sold hereunder if the assets of the Company were sold for their fair market value as of the date of determination of the Fair Market Value, all debts, liabilities and obligations were fully paid and satisfied or adequate provision was made therefor, and all remaining assets of the Company were distributed to the Members in accordance with Section 8.2. The Member whose Membership Interest (or interest therein) is to be sold hereunder (the "Seller") and the Person purchasing such Membership Interest (or interest therein) (whether one or more, the "Purchaser") shall attempt to agree on the Fair Market Value of the Membership Interest (or interest therein) to be sold. If the Purchaser and the Seller are unable to agree on such Fair Market Value within ten (10) days after notice is given by the Purchaser or the Seller requesting such an agreement as to Fair Market Value (the date on which such notice is given being referred to herein as the "Notice Date"), Fair Market Value shall be determined by a qualified independent appraiser, selected as follows: Within twenty (20) days after the Notice Date, the Purchaser shall designate one qualified independent appraiser and the Seller shall designate another qualified independent appraiser. The two qualified independent appraisers shall jointly appoint a third qualified independent appraiser. The third qualified independent appraiser shall determine the Fair Market Value of the Membership Interest (or interest therein) to be sold as provided herein. The fees and expenses of such third qualified independent appraiser shall be borne equally by the Purchaser and the Seller. Fair Market Value shall

be determined as of a date as near as reasonably practicable to the date of the occurrence of the event which results in the sale of the Membership Interest (or interest therein) hereunder.

(b)     At the closing of any sale of a Membership Interest (or interest therein) to be sold on the terms and conditions specified in this Section 6.5, the Seller shall assign and deliver the Membership Interest to the Purchaser free and clear of any Encumbrances, together with such documents of transfer as shall be reasonably requested by the Purchaser, and the Purchaser shall deliver to the Seller the full consideration therefor payable either, at the Purchaser's election, (1) in cash, by wire transfer or other immediately available funds or (2) twenty percent (20%) in cash and the balance evidenced by the execution by the Purchaser of an unsecured promissory note payable in five (5) equal annual installments of principal and interest, beginning on the first (1st) anniversary of the delivery of the promissory note, with interest on such obligation to accrue at the Prime Rate. Such note, if any, described in (2) above shall contain the customary provisions relating to acceleration of maturity in the event of default, interest on past due amounts at the maximum nonusurious rate permitted by law and reimbursement of attorneys' fees and court costs. The Purchaser shall use its reasonable efforts to cause the release of the Seller from all personal liability as a guarantor of any Company indebtedness to any third party. Any transfer or similar taxes involved in such sale shall be paid by the Seller, and the Seller shall provide the Purchaser with such evidence of the Seller's authority to sell hereunder and such tax lien waivers and similar instruments as the Purchaser may reasonably request.

**Section 6.6    Member Tag-Along Right.**

(a)     Notwithstanding anything to the contrary contained this Agreement, in the event that one or more Members holding more than fifty percent (50%) of the Sharing Ratios (collectively, the "Selling Member") propose to Dispose of more than fifty percent (50%) of their Membership Interests to a third-party in one or a series of related transactions, then such Selling Member shall be required to offer an election to the other Members (the "Minority Members") to Dispose of their Membership Interests in the proposed Disposition, based on the same pricing structure and on the same terms as the Selling Member is Disposing of his, her or its Membership Interests in such proposed Disposition, a portion of each such Minority Member's Membership Interests equal to the total Sharing Ratio of the Membership Interests proposed to be Disposed of multiplied by a fraction, the numerator of which is the Sharing Ratio of the Membership Interests owned by such Minority Member and the denominator of which is the aggregate Sharing Ratio of Membership Interests owned by the Selling Member and the Minority Members electing to Dispose of their Membership Interests. Such election shall be made by the Minority Member within ten (10) days after such offer is made by the Selling Member to the Minority Members by providing written notice to the Selling Member of such election within such ten (10) day time period.

(b)     In any sale of Membership Interests pursuant to this Section 6.6, the Minority Members shall be required to make the same representations and warranties and sell such Membership Interests on the same terms and conditions as the Selling Member.

(c)     The amounts received pursuant to a Disposition involving this <u>Section 6.6</u> shall be paid in accordance with <u>Section 8.2</u> as if a liquidation event has occurred.

**Section 6.7     <u>Member Drag-Along Right.</u>**

(a)     Notwithstanding any other provision contained in this Agreement to the contrary, at any time after the Effective Date, a Majority of the Members (the "<u>Dragging Member</u>") may give written notice to the Company and the other Members requiring the sale of all or a majority of the aggregate outstanding Membership Interests, in each case in a transaction constituting a change in control of the Company, to any non-Affiliate(s) of the Company or any of the Members, or to cause the Company to merge with or into or consolidate with any non-Affiliate(s) of the Company or any of the Members (an "<u>Approved Sale</u>"), which written notice shall set forth the material terms of the Approved Sale and be provided by the Dragging Member to the Company and the other Members at least twenty (20) days prior to the consummation of such Approved Sale.

(b)     Each Member hereby agrees to vote (to the extent any such vote is required) all of its Membership Interests, and direct its Manager designees (as applicable) to vote, in favor of an Approved Sale upon the written request of the Dragging Member. If the Approved Sale is structured as a (i) merger, consolidation or sale of assets, each Member shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger, consolidation or sale of assets or (ii) sale of Membership Interests, each Member shall agree to sell all of his, her or its Membership Interests or rights to acquire Membership Interests on the same terms as the Dragging Member. Subject to the limitations set forth herein, each Member shall take all reasonably necessary or desirable actions in connection with the consummation of the Approved Sale as may be requested by the Dragging Member.

(c)     If the Approved Sale is a transaction for which Rule 506 (or any similar rule then in effect) promulgated by the SEC may be available with respect to such transaction (including a merger, consolidation or other reorganization), the Members (other than those qualifying as accredited investors) shall, at the request of the Dragging Member, appoint a purchaser representative (as such term is defined in Rule 501) reasonably acceptable to the Dragging Member. If any Member appoints a purchaser representative designated by the Dragging Member, such Member will be liable for the fees and expenses of such purchaser representative.

(d)     Each Member shall bear its proportionate share (based upon the distributions of the aggregate consideration from the Approved Sale in accordance with <u>Section 5.1</u>) of the costs of any sale of Membership Interests pursuant to an Approved Sale to the extent such costs are incurred by the Dragging Member for the benefit of all Members and are not otherwise paid by the Company or the acquiring party. Notwithstanding anything herein to the contrary, (i) for purposes of this <u>Section 6.7(d)</u>, costs incurred by the Dragging Member in exercising reasonable efforts to take all actions in connection with the consummation of an Approved Sale in accordance with this <u>Section 6.7(d)</u> shall be deemed to be for the benefit of all Members for purposes of this <u>Section 6.7(d)</u> and (ii) costs incurred by other Members on their own behalf will not

31

be considered costs of the transaction hereunder and will, therefore, be borne individually by the Members that incur such costs.

(e)    Each other Member shall bear indemnity obligations in the Approved Sale on the same basis as the Dragging Member; provided, however, that indemnities, holdbacks, escrows and similar items relating to an Approved Sale, that are not paid or established by the Company (other than those that relate to representations or indemnities concerning a Member's valid ownership of its or his Membership Interests free and clear of all liens, claims and Encumbrances or a Member's authority, power and legal right to enter into and consummate a purchase or merger agreement or ancillary documentation, for which such representations or indemnities such Member shall be fully liable on a several and not joint basis) shall be paid or established (including by reducing the portion of the consideration to which such Member would be entitled in the Approved Sale) by the Members on a several and pro rata basis based on the aggregate consideration to be received by such Member in connection with the Approved Sale.

**Section 6.8    New Securities.**

(a)    The Board, in its sole discretion, shall have the authority to create new classes of Membership Interests, with such rights and obligations on the terms and conditions as the Board determines in its sole discretion, and issue New Securities of those classes.  The Company hereby grants to the Members the right to purchase the percentage equaling their Sharing Ratio of New Securities that the Company may, from time to time, propose to sell and issue (such right, the "Right to Maintain").  If the Company proposes to undertake an issuance of New Securities, then it shall give each of the Members written notice of its intention, describing the type of New Securities, the price, and the general terms and conditions upon which the Company proposes to issue the same. Each of the Members shall have thirty (30) days after receipt of such notice to agree to purchase all or a portion of their pro rata share (based on such Member's Sharing Ratio) of the New Securities at the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.  Notwithstanding the foregoing, nothing herein shall prevent the other Members from fully subscribing for their share of the New Securities with respect to which such Members exercised their Rights to Maintain during any such Extension Period.  To the extent a Member fails to fully subscribe for such New Securities through the exercise of their Rights to Maintain within the thirty (30)-day period specified above, then the Company shall have ninety (90) days thereafter to sell the New Securities with respect to which the rights of such Members were not exercised to any Person (including the Members that have fully subscribed for their pro rata share of the New Securities) at a price and upon terms that are not materially more beneficial to the purchaser(s) of such New Securities than those specified in the Company's notice pursuant to this Section 6.8. If the Company has not sold the New Securities within such ninety (90)-day period, then the Company shall not thereafter issue or sell any New Securities without first offering such New Securities to the Members in the manner provided above. The Right to Maintain granted under this Section 6.8 shall not apply to the issuance of Membership Interests in an initial public offering of the Company (or any of its successors). This Right to Maintain shall terminate following the closing of an initial public offering.

(b)    Notwithstanding the foregoing, in lieu of complying with the provisions of Section 6.8(a) above, the Company may elect to give notice to the Members within thirty (30) days after the issuance of New Securities. Such notice shall describe the type, price, and terms of the New Securities. Each of the Members shall have thirty (30) days from the date notice is given to elect to purchase up to the number of New Securities that would, if purchased by such Member, maintain such Member's Sharing Ratio, before giving effect to the issuance of such New Securities. The closing of such sale shall occur within thirty (30) days of the date notice is given to the Members.

## Section 6.9    Assignees

(a)    The Company shall not recognize for any purpose any purported Disposition of all or any portion of a Membership Interest unless the provisions of this Article 6 have been satisfied, all costs of such Disposition have been paid by the assigning Member, such Disposition is exempt from registration under the Securities Act and any applicable state securities act, and there is delivered to the Board, if requested by the Board, an opinion of counsel reasonably satisfactory to the Board with respect thereto, and there is filed with the Company a written and dated notification of such Disposition, in form satisfactory to the Board, executed by both the seller, assignor or transferor and the purchaser, assignee or transferee and such notification (1) contains the acceptance by the purchaser, assignee or transferee of an agreement to be bound by all the terms and provisions of this Agreement and (2) represents that such Disposition was made in accordance with all applicable securities laws and regulations (including suitability standards).  Any Disposition of all or any portion of a Membership Interest shall be recognized by the Company as effective on the date of such notification if the date of such notification is within fifteen (15) days of the date on which such notification is filed with the Company, and otherwise shall be recognized as effective on the date such notification is filed with the Company.

(b)    Any Member who Disposes of all of its Membership Interest in the Company shall cease to be a Member, except that, unless and until a substituted Member has been admitted into the Company, such assigning Member shall retain the statutory rights of the assignor of a member's interest under the Company Law.

(c)    A Person who is the assignee of all or any portion of a Membership Interest, but does not become a substituted Member, and desires to make a further assignment of such interest, shall be subject to all the provisions of this Article 6 to the same extent and in the same manner as any Member desiring to make a Disposition of all or any portion of its Membership Interest.

## Section 6.10    Additional and Substituted Members

(a)    Except as otherwise provided in this Article 6, no Member shall have the right to substitute in its place a purchaser, assignee, transferee, donee, heir, legatee or other recipient of all or any portion of the Membership Interest of such Member.  Any such purchaser, assignee, transferee, donee, legatee, distributee or other recipient of all or any portion of a Membership Interest shall be admitted to the Company as a substituted

33

Member only with the consent of the Board, which consent may granted or withheld by the Board in its sole and absolute discretion.

(b)     No Person shall become an additional or substituted Member until such Person has satisfied the requirements of this Article 6; *provided, however*, that for the purpose of allocating Profits, Losses and other items and distributing cash available for distribution, a Person shall be treated as having become, and as appearing in the records of the Company as, a Member, as the case may be, on such date as the Disposition to such Person was recognized by the Company pursuant to Section 6.2.

## Section 6.11   Repurchase Right

Notwithstanding any of the remedies set forth in Section 3.8, if at any time after the Effective Date a Member (the "Breaching Member") commits an act or fails to act such act or failure to act constitute fraud, gross negligence, bad faith or willful misconduct against the Company, or upon a breach of Section 3.8, the non-Breaching Member (or its designees) shall have the right and option, to purchase all or a portion of the Membership Interest of the Breaching Member (the "Repurchase Option") for seventy-five percent (75%) of its Fair Market Value, as determined in accordance with Section 6.5. Each exercise by the Company (or its designees) of its Repurchase Option shall be effected by the giving of written notice to the Breaching Member, signed by the non-Breaching Member (the "Repurchase Notice"), and such notice shall be effective when given. The Repurchase Notice shall indicate the number and class of the Membership Interests desired to be purchased and the purchase price for the Membership Interests, and shall set forth a time and place of closing for each full or partial exercise of this Repurchase Option by the Company (or its designee).

## ARTICLE 7
## Books and Records; Accounting; Reporting; Tax Elections; Etc.

### Section 7.1     Books and Records

The books and records of the Company shall be maintained by the Board at the principal office of the Company and shall be available for examination at such office by any Member or its duly authorized representative upon reasonable notice. Any Member, at its own expense, may cause an audit of the books and records of the Company and shall furnish a written report thereof to the other Members.

### Section 7.2     Accounting Basis for Tax Reporting Purposes; Fiscal Year; Tax Matters Partner

The books and records of the Company shall be kept on such method of reporting for tax and financial reporting purposes as the Board shall select. The Fiscal Year of the Company shall be the calendar year.

### Section 7.3     Reports

As soon as is reasonably practicable after the end of each Fiscal Year, the Board shall cause the Company to send to each Member a copy of each federal and, if applicable, state

income tax return of the Company for the Fiscal Year that ended, together with such other tax information as shall be reasonably necessary for the preparation by each Member of its federal and state income tax returns. The Board shall also send to the Members any other reports or statements the Board deems necessary from time to time.

### Section 7.4    Tax Matters Member; Company Representative

(a)    During all tax periods prior to December 31, 2017, the Board shall designate one Member to be the "tax matters partner" of the Company pursuant to Code Section 6231(a)(7) (the "Tax Matters Member"). The Tax Matters Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223. The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its capacity as tax matters partner by giving notice thereof on or before the 5th Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. The Tax Matters Member may not take any action contemplated by Code Sections 6222 through 6232 without the consent of the Board, but this sentence does not authorize the Tax Matters Member (or any other Member) to take any action left to the determination of an individual Member under Code Sections 6222 through 6232.

(b)    With respect to tax years beginning after December 31, 2017, the Managers shall designate a partnership representative (any person who is designated as the partnership representative is referred to herein as the "Company Representative") and comply with the provisions under this Section 7.4(b) in lieu of the tax matters partner provisions in Section 7.4(a), except as may otherwise be required under applicable law. In this regard, the Company Representative of the Company pursuant to Section 6223(a) of the Internal Revenue Code shall be any Member or other person with a substantial presence in the United States designated by the Managers in the manner prescribed by the Internal Revenue Service. The Company Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Internal Revenue Code or Treasury Regulations issued thereunder, provided that the Company Representative may file suit only with the approval of a majority of the Managers. The Company Representative shall have the sole authority to act on behalf of the Company under Subchapter C of Section 63 of the Internal Revenue Code (relating to IRS partnership audit proceedings) and in any tax proceedings brought by other taxing authorities, and the Company and all Members shall be bound by the actions taken by the Company Representative in such capacity. The Company Representative shall be reimbursed by the Company for all expenses incurred in connection with all examinations of the Company's affairs by tax authorities, including resulting Proceedings, and is authorized to expend Company funds for professional services and costs associated therewith. If an audit results in an imputed underpayment by the Company as determined under Section 6225 of the Internal Revenue Code, the Company Representative, with the approval of a majority of the Managers, may make the election under Section 6226(a) of the Internal Revenue Code within 45 days after the date of the notice of final partnership adjustment in the manner provided by the Internal Revenue Service. If such an election is made, the

Company shall furnish to each Member of the Company for the year under audit a statement reflecting the Member's share of the adjusted items as determined in the notice of final partnership adjustment, and each such Member shall take such adjustment into account as required under Section 6226(b) of the Internal Revenue Code and shall be liable for any related interest, penalty, addition to tax, or additional amount.

## ARTICLE 8
## Dissolution, Liquidation and Termination of the Company

### Section 8.1    Events Requiring Dissolution

(a)    The Company shall be dissolved upon the first of the following to occur:

(1)    Upon the election to dissolve the Company by the Managers and a Majority of the Members;

(2)    Upon the occurrence of an event as set forth in Section 18-801(a)(4) of the Act;

(3)    Upon the Disposition of all or substantially all of the assets of the Company;

(4)    The entry of a judgment, order or decree of a court of competent jurisdiction adjudicating the Company to be Bankrupt, and the expiration without appeal of the period, if any, allowed by applicable law in which to appeal therefrom; or

(5)    the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)    The events set forth in Section 8.1(a) constitute the only means by which a dissolution of the Company shall occur.

(c)    Upon dissolution of the Company, the business and affairs of the Company shall terminate, and the assets of the Company shall be liquidated under this Article 8; *provided, however,* upon a dissolution of the Company pursuant to Section 8.1(a)(2), the Company may be reconstituted and continued if following such reconstitution and continuation there is at least one (1) remaining Member and the business of the Company is continued by the consent of the Manager and a Majority of the remaining Members within ninety (90) days.

(d)    Dissolution of the Company shall be effective as of the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until there has been a winding up of the Company's business and affairs, and the assets of the Company have been distributed as provided in Section 8.2.

### Section 8.2    Liquidation; Sale of Substantially all of the Assets

(a)    Subject to the restrictions and limitations contained in this Agreement, upon dissolution of the Company, the Board may cause any part or all of the Company assets to be sold in such manner as the Board shall determine in an effort to obtain the best prices for such assets (*provided, however*, that the Board may distribute Company assets in kind to the Members to the extent practicable). During the liquidation period, the Board shall have the right to continue to operate and otherwise to deal with Company property to the same extent it has such right prior to the dissolution of the Company.

(b)    In settling accounts after dissolution of the Company, the assets of the Company shall be paid or distributed in the following order:

(1)    first, to creditors of the Company (including Members, Managers and any Affiliate of any Member or Manager), in the order of priority as provided by law;

(2)    then, an amount equal to the then remaining positive balances in the Capital Accounts of the Members shall be distributed to the Members in proportion to the amount of such balances; and

(3)    then, any remainder shall be distributed to the Members, pro rata, in accordance with their respective Sharing Ratios.

Notwithstanding the foregoing, no distributions shall be made pursuant to this Section 8.2(b) before giving effect to the allocations of Profits, Losses and other items, pursuant to Section 5.2.

### Section 8.3    Distributions in Kind

If any assets of the Company are distributed in kind pursuant to this Agreement, such assets shall be distributed to the Members entitled thereto in the same proportions as the Members would have been entitled to cash distributions if such property had been sold for cash at its fair market value and the net proceeds thereof distributed to the Members. In the event that distributions in kind are made to the Members upon dissolution and termination of the Company, the Capital Account balances of such Members shall be adjusted to reflect the Members' allocable share of gain or loss which would have resulted if the distributed property had been sold at its fair market value (as determined in accordance with the method for determining Book Value).

### Section 8.4    Date of Termination

The Company shall be terminated when all the cash or property available for application and distribution under Section 8.2 hereof shall have been applied and distributed in accordance therewith and a Certificate of Termination has been filed pursuant to Section 8.6 hereof.

### Section 8.5    Waiver of Partition

Each Member hereby irrevocably WAIVES any right or power he may possess to compel a partition or sale of any asset of the Company or to compel a dissolution of the Company other than as expressly set forth in this Agreement.

**Section 8.6    Certificate of Termination**

Upon the completion of dissolution of the Company, the Board shall cause to be filed with the Office of the Secretary of State of the State of Delaware a Certificate of Termination, pursuant to the requirements of the Act, canceling the Certificate of Formation.

## ARTICLE 9
## Representations and Warranties of the Members

**Section 9.1    Acquisition of Interest for Investment**

Each Member hereby represents and warrants to the Company and the Members that the acquisition of its Membership Interest is made for its own account for investment purposes only and not with a view toward the resale or distribution of such Membership Interest.

**Section 9.2    Access to Information**

Each Member has been afforded full opportunity to request any and all relevant information and ask questions concerning the proposed purposes and business of the Company, has been provided all information and copies of documents it has requested and has received answers to such questions to its full satisfaction. Each Member represents and warrants that such Member has not relied upon any information relating to the Company other than information supplied by the Company.

**Section 9.3    No Registration**

Each Member recognizes that the Membership Interests have not been registered under the Securities Act or applicable state securities laws and are being sold pursuant to the exemptions from registration offered by Section 4(2) of the Securities Act and the regulations promulgated thereunder and by applicable state law provisions. Each Member recognizes that, as a consequence, its Membership Interest must be held indefinitely unless it is subsequently registered under the Securities Act and applicable state securities laws, or an exemption from such registration is available, so that each Member must bear the economic risk of investment in its Membership Interest for an indefinite period of time.

**Section 9.4    No Obligation to Register**

Each Member acknowledges that neither the Company nor the Board is under any obligation to register the Membership Interests under any securities laws, and none of them has any present intention to do so. Each Member understands that there is no established market for the Membership Interests, and it is extremely unlikely that any public or private market will develop.

**Section 9.5    Suitability of Investment**

Each Member understands the nature of the investment being made and that it involves a high degree of risk. Each Member recognizes that the Company is a newly organized entity and

has no history of operations or earnings.

### Section 9.6     No Tax Representations

Each Member represents and warrants that it has consulted its own tax advisor with respect to the tax aspects of such Member's acquisition and ownership of its Membership Interest. Each Member represents and warrants that it is not relying upon any representations that may have been made by the Company or any Member as to any tax projections or tax consequences of the Member's acquisition and ownership of its Membership Interest.

## ARTICLE 10
## Meetings of Members

### Section 10.1   Place of Meetings

All meetings of the Members shall be held at the principal office of the Company or at such other place within or without the State of Delaware as may be determined by the Board and set forth in the respective notice or waivers of notice of such meeting. Notwithstanding anything contained herein to the contrary, there shall be an annual meeting of the Members, which shall take place at such time and place as determined by the Board.

### Section 10.2   Meetings of Members

Meetings of the Members may be called at any time by the Board or any one or more Members holding, in the aggregate, at least fifty percent (50%) of the Sharing Ratios held by all Members.

### Section 10.3   Notice of Meetings of Members

Written or printed notice stating the place, day and hour of the meeting shall be delivered not less than seven (7) nor more than sixty (60) days before the date of the meeting, either personally, by fax or by mail, by or at the direction of the Board to each Member of record entitled to vote at such meeting.

### Section 10.4   Quorum

A Majority of the Members shall constitute a quorum at all meetings of the Members, except as otherwise provided by law. Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. If, however, such quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until the holders of the requisite amount of Sharing Ratios shall be present or represented. A Member may be present or may be represented by proxy for purposes of this Section 10.4.

### Section 10.5   Voting on Matters

At any meeting of the Members at which a quorum is present, the vote of a Majority of the Members voting shall be the act of the Members, unless the vote of a greater number is required by law or this Agreement.

### Section 10.6   List of Members Entitled to Vote

The Board shall cause to be made, at least five (5) days before each meeting of the Members, a complete list of the Members entitled to vote at such meeting, or any adjournment of such meeting, arranged in alphabetical order, with the address of and the Sharing Ratios held by each, which list, for a period of five (5) days prior to such meeting, shall be kept on file at the principal office of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to inspection of any Member during the whole time of the meeting. However, failure to comply with the requirements of this Section 10.6 shall not affect the validity of any action taken at such meeting.

### Section 10.7   Registered Members

The Company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact of such Membership Interest for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other Person, whether or not it shall have express or other notice of such claim or interest, except as expressly provided by this Agreement or the laws of the State of Delaware.

### Section 10.8   Actions With or Without a Meeting and Telephone Meetings

Notwithstanding any provision contained in this Article 10, all actions of the Members provided for herein shall be taken either at a meeting and evidenced by written minutes thereof executed by an authorized Member or by written consent without a meeting. Any meeting of the Members may be held by means of a telephone conference in which all of the Members can hear or otherwise communicate with each other. Any action which may be taken by the Members without a meeting shall be effective only if the written consent (or consents) sets forth the action so taken, and is signed by the holder or holders of Sharing Ratios constituting not less than the minimum amount of Sharing Ratios that would be necessary to take such action at a meeting at which the holders of all Sharing Ratios entitled to vote on the action were present and voted. If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Board shall, within seven (7) calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

### ARTICLE 11
### Miscellaneous Provisions

### Section 11.1   Address for Notices

All notices, demands, consents, approvals and reports provided for in this Agreement shall be in writing and shall be given to the parties at the addresses set forth herein or at such

other addresses as the Member may hereafter specify in writing. Such notices may be delivered by hand or by facsimile, or may be mailed, postage prepaid, by certified or registered mail, return receipt requested, by a deposit in a depository for the receipt of mail regularly maintained by the United States Postal Service. All notices that are hand delivered or delivered by facsimile shall be deemed given on the date of delivery. All notices that are mailed in the manner provided above shall be deemed given three (3) days after being mailed.

### Section 11.2    Additional Documents and Acts

In connection with this Agreement, as well as all transactions contemplated by this Agreement, the Members agree to execute such additional documents and papers, and to perform and do such additional acts as may be necessary and proper to effectuate and carry out all of the provisions of this Agreement.

### Section 11.3    Qualification in Foreign Jurisdictions

The Members shall take such steps as are necessary or desirable to allow the Company to conduct business in any jurisdiction where the Company desires to conduct business.

### Section 11.4    Application of Delaware Law; Venue

This Agreement and the application or interpretation hereof, shall be governed exclusively by the laws of the State of Delaware, and specifically the Act. Venue for any dispute shall lie in Harris County, Texas.

### Section 11.5    Headings and Sections

The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof. Unless the context requires otherwise, all references in this Agreement to Sections or Articles shall be deemed to mean and refer to Sections or Articles of this Agreement.

### Section 11.6    Confidentiality.

The terms of this Agreement, the identity of any Member, any principal of a Member or any Affiliate of any Member or the relative or absolute rights or interests of any of the Members, all business, financial or other information relating directly to the conduct of the business and affairs of the Company, and the identity of any Person with whom the Company may be holding discussions with respect to any investment, acquisition or other transaction or in whom the Company may invest directly or indirectly (collectively, the "Information") that has not been publicly disclosed with the consent of the Board is confidential and proprietary information of the Company the disclosure of which would cause irreparable harm to the Company and the Members. Accordingly, each Member represents that it will not and will direct its shareholders, partners, members, directors, officers, managers, agents, advisors (including, without limitation, any appraiser selected by or on behalf of it) and Affiliates not to, disclose to any Person any Information or confirm any statement made by third persons regarding Information unless the Board consents thereto or until the Company has publicly disclosed the Information and has notified each Member that it has done so. The covenants contained in this Section 11.6 will

41

survive the Disposition of the Membership Interest of any Member and the termination of the Company.

Notwithstanding any contrary provision in this Section 11.6, any Member may, without breach of the covenants set forth in this Section 11.6 and without notice to or consent of the Board, disclose any Information in any filing required of such Member with any securities commission or other regulatory agency, to any financial advisors, accountants, attorneys or similar representatives or as may otherwise be required by applicable law.

### Section 11.7   Amendments

(a)      Except as otherwise expressly set forth in this Agreement, the Certificate of Formation of the Company and this Agreement may be amended, by action of the Board and a Super Majority of the Members.

(b)      In addition to amendments pursuant to Section 11.7(a), amendments of this Agreement may be made from time to time by the Board, without the consent of any of the Members, (a) to cure any ambiguity, or to correct or supplement any provision hereof which may be inconsistent with any other provision hereof, (b) to delete or add any provision of this Agreement required to be so deleted or added by any state or provincial securities commissioner or similar official, which addition or deletion is deemed by such commission or official to be for the benefit or protection of the Members, (c) to revise this Agreement as necessary to comply or conform with any revisions in applicable laws, rules and/or regulations governing the Company, (d) to effect a change that the Board in its sole discretion determines to be necessary or desirable to qualify or continue the qualification of the Company as a limited liability company or as an Entity in which the Members have limited liability under the laws of any state or to ensure that the Company will not be taxed as an association taxable as a corporation for federal income tax purposes, and (e) to reflect the admission of additional Members or substituted Members in the Company; *provided however*, that no amendment shall be adopted pursuant to clauses (a) through (d) above unless the adoption thereof, in the reasonable opinion of the Board, is for the benefit of or not adverse to the interest of the Members and, in the opinion of counsel, does not affect the limited liability of the Members or the status of the Company as a partnership for federal income tax purposes. The Board shall promptly notify the Members of any amendment adopted pursuant to clauses (a) through (e) of this Section 11.7(b).

### Section 11.8   Numbers and Gender

Where the context so indicates, the masculine shall include feminine and neuter, and the neuter shall include the masculine and feminine, and the singular shall include the plural and vice versa.

### Section 11.9   Binding Effect

Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the Members, their distributees, heirs, legal representatives, executors, administrators, successors and assigns.

### Section 11.10  No State-Law Partnership

The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member, for any purposes (including bankruptcy purposes) other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

### Section 11.11  Entire Agreement

This Agreement and the schedules and exhibits hereto, if any, contain all of the understandings and agreements of whatsoever kind and nature existing between the Members with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings with respect thereto.

### Section 11.12  Severability

Every provision hereof is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

### Section 11.13  No Waiver

No waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a waiver of any other breach or default under this Agreement. Failure on the part of any Member to complain of any act or omission of any other Member, or to declare such other Member in default irrespective of how long such failure continues, shall not constitute a waiver hereunder. No notice to or demand on a defaulting Member shall entitle such defaulting Member to any other or further notice or demand in similar or other circumstances.

### Section 11.14  Counterparts

This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and shall be binding upon the Member who executed the same, but all of such counterparts shall constitute the same agreement.

### Section 11.15  Approvals

Except where otherwise indicated, all approval, consent and other similar rights of the Managers and the Members pursuant to this Agreement may be exercised by such Managers and Members, and such approvals and consents may be granted or denied by such Managers and Members, in their sole and absolute discretion.

### Section 11.16  Spouse Acknowledgement

43

By execution hereof, the spouse of each Member hereby consents to the terms of this Agreement to the extent applicable to such spouse and agrees to comply in all respects with the terms and provisions hereof.

### Section 11.17  Creditors Not Benefited

Nothing in this Agreement is intended to nor shall it benefit any creditor of the Company. No creditor of the Company will be entitled to require the Board to solicit or accept any loan or Capital Contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

### Section 11.18  Successors and Assigns

This Agreement shall be binding upon and shall inure to the benefit of the Members, and their respective heirs, legal representatives, successors and assigns; *provided, however*, that nothing contained herein shall negate or diminish the restrictions set forth in Article 6.

### Section 11.19  Exhibits and Schedules

Each exhibit and schedule to this Agreement is incorporated herein for all purposes.

*[The remainder of this page is intentionally blank]*

44

IN WITNESS WHEREOF, the undersigned, being the initial Managers and all of the Members of the Company have caused this Agreement to be duly adopted by the Company effective as of the date first above written.

**MANAGERS:**

COINMINT LIVING TRUST

By:_____
Name: Ashton H. Soniat
Title: Trustee

_____
**PRIEUR LEARY**

**MEMBERS:**

COINMINT LIVING TRUST

By:_____
Name: Ashton H. Soniat
Title: Trustee

MINVEST CAPITAL LTD.,

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the undersigned, being the initial Managers and all of the Members of the Company have caused this Agreement to be duly adopted by the Company effective as of the date first above written.

**MANAGERS:**

COINMINT LIVING TRUST

By:
Name: Ashton H. Soniat
Title: Trustee

PRIEUR LEARY

**MEMBERS:**

COINMINT LIVING TRUST

By:
Name: Ashton H. Soniat
Title: Trustee

MINVEST CAPITAL LTD.,

By:
Name:
Title:

[*Signature Page to Limited Liability Company Agreement of Coinmint, LLC*]

## COINMINT, LLC

## SCHEDULE 1

### Dated effective as of November 21, 2016

Names, Addresses, Initial Capital Contributions and Sharing Ratios of the Members

| Names and Addresses of Members | Initial Capital Contributions | Sharing Ratios |
|---|---|---|
| **Members** | | |
| Coinmint Living Trust | $25,000 | 50% |
| Mintvest Capital Ltd. | $25,000 | 50% |
| **TOTALS** | $50,000 | 100% |

# RESOLUTION OF THE MEMBERS

## OF

## COINMINT LLC

Pursuant to Section 10.8 of the Limited Liability Company Agreement of Coinmint LLC, the following resolution was adopted by a majority of the Members entitled to vote thereon:

RESOLVED by the Members of Coinmint, LLC, as follows:

Prieur Leary is removed from the Board of Coinmint, LLC.

Dated this 2nd day of December, 2019.

COINMINT LIVING TRUST (81.8% VOTING RIGHTS)

By _____ 12/03/19
Name: Ashton Soniat
Title: Trustee and BOD Designee for Coinmint Living Trust

# RESOLUTION OF THE MEMBERS

## OF

## COINMINT LLC

Pursuant to Section 10.8 of the Limited Liability Company Agreement of Coinmint LLC, the following resolution was adopted by a majority of the Members entitled to vote thereon:

RESOLVED by the Members of Coinmint, LLC, as follows:

The Limited Liability Company Agreement of Coinmint, LLC is hereby amended to reflect that as of the date indicated below, the sole Manager of Coinmint, LLC shall be Coinmint Living Trust.

Dated this 2nd day of December, 2019.

COINMINT LIVING TRUST (81.8% VOTING RIGHTS)

By _____ 12/03/19

Name: Ashton Soniat

Title: Trustee and BOD Designee for Coinmint Living Trust

# RESOLUTION OF

# COINMINT LLC

Pursuant to Section 10.8 of the Limited Liability Company Agreement of Coinmint LLC, by consent of a Majority of the Members and Managers and by Action of the Board and a Super Majority of the Members, the following resolution was adopted:

RESOLVED by the Members and Board of Directors of Coinmint, LLC, as follows:

The Limited Liability Company Agreement of Coinmint, LLC is hereby amended as follows:

Section 4.1 (b) (amended):  From and after the Effective Date, the Board shall be comprised of one (1) or more individuals.  A Majority of the Members shall determine the composition of the Board.  The Managers, acting by Majority Vote, shall select one Manager to serve as Chairman of the Board.  The Chairman of the Board shall preside at meetings and generally manage the affairs of the Board.

Section 4.2 (amended):  Any Manager may be removed from the Board with or without cause by a Majority Vote of the Members.

Dated this 2th day of December, 2019.

COINMINT LIVING TRUST (81.8% VOTING RIGHTS)

By _____ 12/03/19
Name:  Ashton Soniat
Title:  Trustee and BOD Designee for Coinmint Living Trust