UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KATENA COMPUTING TECHNOLOGIES, INC., | : | |
| | : | |
| *Petitioner*, | : | |
| | : | |
| v. | : | No. 3:23-mc-48 (SDV) |
| | : | |
| JIM DeNAUT, | : | |
| | : | |
| *Respondent*. | : | |
| | : | |
| COINMINT, LLC, | : | |
| | : | |
| *Intervenor* | : | |

## <u>RULING ON MOTION TO COMPEL ARBITRAL SUMMONS</u>

Pending before the Court is Katena Computing Technologies, Inc.'s motion for an order pursuant to 9 U.S.C. § 7 compelling respondent Jim DeNaut, a Connecticut resident, to comply with a summons to testify in a California arbitration.  ECF 1.  The parties to the arbitration are Katena and Coinmint, LLC.  The arbitration panel issued the summons at the request of Coinmint's counsel Fletcher Alford, Esq. and Robert Lemus, Esq., who are attorneys with the law firm of Gordon Rees Scully Mansukhani, LLP ("Gordon Rees").  ECF 1-2.  Given that DeNaut has asked the Court to impose conditions on the enforcement of the summons, the Court permitted Coinmint to intervene in this matter including at an evidentiary hearing in which Coinmint and DeNaut called witnesses and submitted exhibits.  ECF 35.

DeNaut seeks two conditions to enforcement of the summons.  First, he asserts that, during a January 6, 2023 telephone call, Gordon Rees agreed to represent him as a witness in the arbitration and engaged in a privileged communication with him but then, three weeks later, filed

suit against him in California on behalf of Coinmint.  He therefore requests that Gordon Rees be disqualified from examining him in the arbitration.  *See* ECF 79 at 25.  Second, because DeNaut asserts that his communications with Attorneys Alford and Lemus and Coinmint's general counsel Randy Foret during the January 6 call were privileged, he also requests that Coinmint and Gordon Rees be prohibited from "using" that information.  *See id.*

For the reasons that follow, the Court GRANTS the Motion to Compel subject to the orders below requiring the limited disqualification of Gordon Rees and the protection of DeNaut's attorney-client privilege.

## A.  PROCEDURAL HISTORY

The relevant procedural history is as follows.  On February 3, 2023, the arbitration panel issued a summons to DeNaut at the request of Coinmint's counsel, Attorneys Alford and Lemus of Gordon Rees, and issued a revised summons on March 8.  ECF 1-1, 1-2.  On March 23, 2023, DeNaut's counsel requested a continuance citing, *inter alia*, counsel's need to investigate DeNaut's concerns about his prior interactions with Attorney Alford, especially given that Gordon Rees had recently filed suit against him in California on behalf of Coinmint.  *See* ECF 1-3.  After conducting that investigation, DeNaut's counsel wrote a short, two-page letter to the panel on April 17, 2023 asserting that DeNaut had discussed the substance of the arbitration with Alford in a phone call on January 6, 2023 under the belief that Alford was representing him as a witness and that DeNaut had provided information on disputed issues in the arbitration, which DeNaut "reasonably believed he was providing during an attorney-client privileged conversation."  *See* ECF 1-5.  Counsel therefore asserted that "Gordon Rees cannot pursue [Coinmint's] action against Mr. DeNaut in California and cannot question him in these [arbitration] proceedings."  *Id.*  Counsel indicated they were "open to considering potential

methods to protect Mr. DeNaut's right not to be questioned by Gordon Rees nor have anyone (including Coinmint) use or reveal the information he shared with [Gordon Rees]," and they requested further discussion with the panel on how to navigate that issue in the arbitration. *Id.* However, although the panel immediately afforded Katena and Coinmint the opportunity to submit argument and evidence on these issues, the panel did not solicit any further information from DeNaut. Instead, a mere three days after DeNaut's April 17 letter, the panel issued an order summarily concluding that no "actual or prospective" attorney-client relationship ever existed between Attorney Alford and DeNaut. *See* ECF 1-6. Ironically, the panel relied solely on evidence it solicited from Coinmint and criticized DeNaut for not providing more information despite ignoring his request to open a discussion. *Id.*

On May 10, 2023, DeNaut filed an application for relief in the Connecticut Superior Court seeking to disqualify the Gordon Rees firm from questioning him in the arbitration and to preclude Coinmint and Gordon Rees from using privileged information against him. *See* ECF 33-1. On May 12, 2023, Katena filed the instant Motion to Compel compliance with the arbitral summons pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 7. ECF 1. The parties have agreed to consolidate these issues for decision by this Court. [1] *See* ECF 33.

## B. SCOPE OF REVIEW

### 1. Jurisdiction and venue

Section 7 of the FAA provides in relevant part that arbitrators may summon witnesses to testify and bring documentation and that the district court, on petition, "may compel the attendance of such person or persons before said arbitrator or arbitrators, or punish said person or

---

[1] Although DeNaut filed his state court application against Gordon Rees, the firm did not seek to intervene in the instant proceedings.

persons for contempt[.]"  9 U.S.C. § 7.  Although the FAA is not an independent source of subject matter jurisdiction, this Court has diversity jurisdiction because the parties – Katena (California), DeNaut (Connecticut), and Coinmint (Puerto Rico/New York) are diverse – and "the value of the object of the [underlying] litigation," namely, the $23 million that Coinmint seeks to recover in the arbitration, exceeds $75,000.  *See Washington Nat'l Ins. Co. v. OBEX Grp. LLC*, 958 F.3d 126, 133-35 (2d Cir. 2020) (discussing requirements for diversity jurisdiction re: petition under the FAA).  Venue is proper because DeNaut has been summoned to testify in this district. [2]  *See id.* at 139-40.  Furthermore, as noted above, the parties have agreed to the issues for adjudication by this Court in the interest of efficiency.  *See* ECF 33.

**2.  Scope of authority under 9 U.S.C. § 7**

The Second Circuit has held that a district court considering a section 7 petition is "not obliged" to consider the respondent's objections to an arbitral summons.  *See OBEX*, at 139 ("The panel is responsible for issuing summonses, hearing evidence, and ruling on objections."). While the Second Circuit expressly left open the question of whether the court nonetheless has discretion to consider objections, *see id.*, at least two district court decisions have answered that question in the affirmative.  *See Turner v. CBS Broad. Inc.*, 599 F. Supp. 3d 187, 193-95 (S.D.N.Y. 2022); *Laufman v. Anpol Contracting, Inc.*, No. 94-cv-5362 (CSH), 1995 WL 360015, at *1 (S.D.N.Y. June 13, 1995).  As Judge Rakoff reasoned with respect to privilege objections, section 7's provision that the court "may" compel compliance implies the authority to consider whether such enforcement would result in abuse. [3]  *See Turner*, at 193-95.  He explained:

---

[2] The California arbitrators intend to travel to Connecticut to take DeNaut's testimony.  *See* Summons, ECF 1-1; *see also* ECF 1 at 2-3.

[3] Judge Rakoff also sat by designation on the Second Circuit panel in *OBEX*.

> It would be improper to construe section 7 – which expressly contemplates the
> possibility of a district court not enforcing an arbitral subpoena – to prohibit a
> court from "protect[ing] a person subject to a subpoena" where the documents or
> testimony called for are clearly privileged.  Fed. R. Civ. P. 45(d).  To construe
> section 7 and Rule 45(d) otherwise would allow a private party engaged in
> arbitration to hijack the court's coercive power, even in cases of egregious
> misapplication of privilege law.

*Id.* at 194; *see also*, *e.g.*, *Laufman*, at *1 (holding that section 7 provides the Court with

"concomitant authority to consider objections such as overbreadth, lack of relevance, and

proprietary information" and modifying an arbitral summons to require a confidentiality review

process pursuant to *Local Lodge 1746 v. Pratt & Whitney*, 329 F. Supp. 283, 286 (D. Conn.

1971)).

Nonetheless, Judge Rakoff noted that federal policy favors arbitration and cautioned that

"deference to the arbitrator's privilege and admissibility rulings (whether express or implicit)

will be appropriate in the mine run of cases to avoid making a section 7 petition a vehicle to

obtain, in effect, interlocutory appeal of discovery rulings obtained in arbitration." *Turner*, at

194-95; *see also*, *e.g.*, *Bailey Shipping Ltd. v. Am. Bureau of Shipping*, No. 12-cv-5959 KPF,

2014 WL 3605606, at *4 (S.D.N.Y. July 18, 2014) (declining to review relevance and burden

objections because there was "no basis on which to interfere with" a "straightforward" arbitral

summons).  In other words, a district court should not "hold itself open as an appellate tribunal to

rule upon any questions of evidence that may arise in the course of the arbitration." *Compania

Panemena Maritima v. J.E. Hurley Lbr. Co.*, 244 F.2d 286, 288 (2d Cir. 1957).

### 3.   The circumstances warrant *de novo* review of the objections

In the present matter, although the arbitration panel has overruled DeNaut's objections

that Gordon Rees should be disqualified from examining him and that his communications to

Gordon Rees were privileged, *see* ECF 1-6, three factors weigh in favor of reviewing those

objections *de novo* in this section 7 proceeding: (i) as a non-party to the Katena/Coinmint arbitration, DeNaut did not consent to have his rights adjudicated by an arbitrator rather than a court; (ii) the panel did not provide DeNaut an adequate opportunity to develop the record; and (iii) the district courts do not defer to arbitrators on questions of attorney disqualification.

*First*, whereas a party's consent to arbitrate provides a "particularly strong reason" to defer to an arbitrator's determinations on privilege and confidentiality as to that party, non-party witnesses like DeNaut "have not consented to have their legal rights adjudicated by an arbitrator rather than a court." *Turner*, at 194. Consequently, the panel's determination is entitled to less deference. *Compare*, *e.g.*, *Turner*, at 195 (deferring to panel's privilege determination where respondent was a consenting party to arbitration), *with Odfjell ASA v. Celanese AG*, 380 F. Supp. 2d 297, 301-02 (S.D.N.Y. 2005) (declining to defer to panel's ruling on non-party's privilege objection).[4]

*Second*, the panel did not provide DeNaut with a fair opportunity to support his contention that Gordon Rees has a disqualifying conflict of interest, which also cuts in favor of *de novo* review. As explained in *Turner*, a district court's authority under section 7 is not merely a rubber stamp, and the court retains the power and duty "to protect people from enforcement of patently unlawful subpoenas." *See Turner*, at 194. The Court finds further reason by analogy to Section 10 of the FAA, which provides for vacatur of a final arbitration award, *inter alia*, "where the arbitrators . . . refus[ed] to hear evidence pertinent and material to the controversy[.]" 9 U.S.C. § 10. As a non-party to the arbitration, DeNaut will have no recourse to section 10 relief after the completion of the arbitration as a party to the proceeding ordinarily would. Furthermore, once he testifies, the genie cannot be put back in the bottle, which is of particular

---

[4] Coincidentally, *Odfjell* is another district court decision by Judge Rakoff.

concern given his colorable ethics-based objections and the potential prejudicial impact on his defense of Coinmint's parallel lawsuit pending in the Northern District of California.  These circumstances significantly increase the stakes of the issues raised in the present proceeding and render it unlike the type of interlocutory review that the Second Circuit warned against in *Compania Panemena*, 244 F.2d at 288.

      *Third*, district courts in the Second Circuit have repeatedly held that "[a]ttorney disqualification is better decided by courts rather than arbitrators." [5]  *See Canfield v. SS&C Techs. Holdings, Inc.*, No. 18-cv-10252 (ALC), 2021 WL 1022698, at *2-3 (S.D.N.Y. Mar. 17, 2021); *see also Nw. Nat. Ins. Co. v. Insco, Ltd.*, No. 11-cv-1124 (SAS), 2011 WL 4552997, at *4 (S.D.N.Y. Oct. 3, 2011) ("Issues of a lawyer's professional responsibilities are not within the customary expertise of industry arbitrators and are appropriately decided by the Court."); *Munich Reinsurance Am., Inc. v. ACE Prop. & Cas. Ins. Co.*, 500 F. Supp. 2d 272, 275 (S.D.N.Y. 2007) ("[D]isqualification of an attorney for an alleged conflict of interest[] is a substantive matter for the courts and not arbitrators.").  Accordingly, the Court concludes that *de novo* review of DeNaut's objections to the arbitral summons is warranted under the circumstances.

### 4.  Scope of the record on review

      Given the panel's failure to provide DeNaut a fair opportunity to develop the record and given that disqualification is best decided by the courts, the Court will neither limit its review to the record before the arbitration panel nor remand for further development of these issues. *Compare Nw. Nat. Ins. Co. v. Insco*, 2011 WL 4552997 (disqualifying attorney from arbitration without reference to record before the panel), *and Troika Media Grp., Inc. v. Stephenson*, No.

---

[5] Decisional precedent also confirms that a district court may adjudicate a request to disqualify an attorney in arbitration proceedings set in other districts.  *See Canfield*, at *3 (citing *Simply Fit of N. Am., Inc. v. Poyner*, 579 F. Supp. 2d 371 (E.D.N.Y. 2008)).

19-cv-145 (ER), 2019 WL 5587009, at *1 (S.D.N.Y. Oct. 30, 2019) (same), *with Odfjell*, 380 F.

Supp. 2d at 302-303 (where privilege was at issue but not disqualification, remanding to panel

for further development of record on non-party's privilege objection to arbitral summons).

Instead, the Court conducted an evidentiary hearing at which Coinmint and DeNaut elicited

witness testimony and submitted exhibits, all of which the Court has considered in rendering this

decision. [6]

## C.  FACTUAL HISTORY

### 1.  Facts not in dispute

The following facts are either undisputed or unrebutted except where otherwise indicated.

In the arbitration, Coinmint, a bitcoin mining firm, seeks recovery of approximately $23,000,000

that it paid to Katena pursuant to a 2021 contract for manufacture and delivery of bitcoin mining

machines.  DeNaut has material information concerning the parties' relationship.

#### a.  DeNaut's affiliation with Coinmint

DeNaut is a Wall Street veteran and an experienced professional investor, specializing in

preparing companies to be sold, to merge with other entities, or to raise capital.  ECF 89 at 36.

In April 2021, DeNaut began working with Coinmint, albeit without compensation, to assess

whether Coinmint was prepared to go public, could take on additional capital, or was a candidate

for merger or acquisition.  *Id.* at 37.  During the course of this engagement, DeNaut had

---

[6] At the hearing, DeNaut testified on his own behalf, and Coinmint called its general counsel
Randy Foret and Attorney Fletcher Alford of Gordon Rees.  Because Alford is representing
Coinmint in this matter, the Court ordered that if Coinmint chose to call him to testify then he
would be precluded from examining other witnesses in the hearing.  *See* D. Conn. L. Civ. R.
83.13(b) (witness-advocate rule).  Accordingly, another Gordon Rees attorney (Steven
Zakrzewski, Esq.), who had no prior involvement in this matter, capably conducted the
examinations in Attorney Alford's stead, which the Court permitted in its discretion under Local
Rule 83.13(c).  *See* ECF 89 at 16:10-23:17.

discussions with Coinmint about serving as its CEO and various persons, both inside and outside Coinmint, referred to him as Coinmint's CEO. [7]  *Id.* at 37-39.  Ultimately, however, DeNaut and Coinmint were unable to reach terms on a formal employment agreement, and, DeNaut's affiliation with Coinmint terminated around the beginning of November 2021.  *Id.* at 41:1-42:4. DeNaut did not receive any payment, equity or other remuneration from Coinmint for his services.

### b.  Katena's offer to DeNaut

Between June and September 2021, prior to DeNaut's disaffiliation from Coinmint, he spoke frequently with Katena's CEO, Henry Monzon, concerning the contractual relationship between Coinmint and Katena, which became increasingly strained.  *Id.* at 114-15.  In November 2021, when DeNaut informed Monzon that he had not reached an employment agreement with Coinmint, Monzon offered him an advisory role with Katena in return for equity compensation. *See* Ex. K.  DeNaut informed Coinmint's general counsel, Randy Foret, that he had a job offer with Katena.  ECF 89 at 239:5-6, 240:7-19.  However, DeNaut rejected Katena's offer on November 9, 2021, and he never received any compensation from Katena, monetary or otherwise. [8]  *Id.* at 49:3-14, 194:4-9.

---

[7] Coinmint argues that DeNaut's general credibility is suspect because, during the roughly six months of his engagement and negotiations with Coinmint, he failed to correct individuals referring to him as CEO despite never finalizing any agreement to serve in that capacity.  In the Court's view, it was reasonable for DeNaut to correct such misunderstanding only when it was material.  *See* ECF 89 at 37-39.  In any event, the Court does not assign much importance to this attenuated evidence in making its credibility findings below, especially given that there is much more direct evidence concerning the witnesses' credibility regarding the disputed January 6 call.

[8] Although Coinmint argues that DeNaut lacks credibility because he initially responded to Katena's job offer saying he was "thrilled to be able to work with" Katena, *see* Ex. K, the argument is unavailing.  The record shows that DeNaut informed Foret of the November 5 job offer; he declined the offer on November 9; he informed Foret by mid-November that he was not working for Katena, *see* ECF 89 at 241:19-24, 266:8-10; and he never received any

### c. DeNaut's attempts to bridge the Katena/Coinmint dispute

After his disaffiliation from Coinmint, DeNaut continued informal attempts to bridge Coinmint's contractual dispute with Katena.  Throughout November 2021, DeNaut and Foret had frequent conversations about how to resolve the dispute, which became more sporadic in December 2021 and tailed off in January 2022.  ECF 89 at 216:12-24; Ex. I, M, N, O.  Among the solutions they discussed was finding an alternative purchaser to step into Coinmint's shoes and reimburse its $23 million investment.  ECF 89 at 198:9-199:4, 258:1-259:20; Ex. O.  This necessitated a feasibility study of which Foret was aware.  ECF 89 at 146:21-147:9.

Meanwhile, Coinmint retained outside counsel (TCF Law Group) to pursue its dispute with Katena.  On November 16, 2021, TCF sent a letter to DeNaut confirming Coinmint's knowledge that DeNaut was working to try to resolve the dispute, including searching for an alternative purchaser.  Ex. H.  Although the letter warned that Coinmint might have potential claims against DeNaut and that he should preserve documents, *id.*, he and Foret continued working closely toward Coinmint's goal of resolving the Katena dispute.  Ex. I, M, N, O.  Among other things, Foret asked DeNaut to obtain information from Katena, which DeNaut did obtain and report back to Foret.  Ex. O.

At some point, DeNaut began considering whether he himself could be the alternative purchaser.  ECF 89 at 54-55.  He signed a nondisclosure agreement ("NDA") with Katena in order to obtain information for his feasibility study.  ECF 89 at 165-166.  Foret was aware, at a minimum, that the NDA was contemplated, and he asked DeNaut to obtain the sort of information from Katena that typically might be subject to an NDA, which DeNaut did.  Ex. I,

---

compensation from Katena.  Additionally, DeNaut's transparency on this point undermines Coinmint's contention that he harbored a secret loyalty to Katena that did not surface until the January 6 call.

O; ECF 89 at 165:14-23-166:22-23; 313:11-314:11.  Foret was also aware that DeNaut proposed

to travel to California for that purpose.  Ex. M; ECF 89 at 147:2-9; 241:13-24.  During the course

of the feasibility study, DeNaut had discussions with Katena about the possibility of Katena

engaging in bitcoin mining operations, which would have put Katena in competition with

Coinmint.  DeNaut believed this to be a critical part of the feasibility study.  ECF 89 at 152-54,

159-60.  In any event, by March 2022, DeNaut decided that stepping into Coinmint's shoes was

not economically feasible, concluded his feasibility study regarding a potential third party

purchaser of the contract, and ended substantive discussions with Katena.  *Id.* at 54-55. DeNaut

last spoke to Katena in May or early June 2022.  *Id.* at 55, 173.

     **d.  Findings of fact re: the TCF letter**

     Although Foret disputes it, the Court finds that after TCF sent the November 2021

litigation hold letter to DeNaut asserting that Coinmint might have potential claims against him,

Foret assured DeNaut that he was not a litigation target and that Coinmint was not adverse to

him.  DeNaut testified that Foret notified him beforehand (November 15) that TCF would be

sending the letter, and then assured DeNaut afterward (November 17) that it was just a document

retention letter and that Coinmint and DeNaut were still aligned.  ECF 89 at 60.  Although Foret

denies alerting DeNaut before the letter arrived, *id.* at 245-46, there is written evidence that

DeNaut and Foret spoke on those dates.  *See id.* at 195-96; Ex. 21.  Foret also testified that he did

not "recall" specifically discussing the letter afterward but admitted that "I recall us discussing

this kind of information."  *Id.*  Relatedly, DeNaut testified that if he had believed in November

2021 that Coinmint was threatening to sue him, he would not have continued to communicate

with Foret after receipt of the TCF letter.  *Id.* at 61:9-12.  The Court credits DeNaut's testimony

given Foret's inconclusive denial, the document showing that they spoke just before and after the

letter, and the close and frequent manner in which DeNaut and Foret continued to develop ideas for resolving the Katena dispute even after the TCF letter.  *See id*. at 60-61.

### e.   DeNaut's call with Choate Hall & Stewart

In April 2022, Coinmint commenced arbitration proceedings against Katena.  Coinmint hired replacement outside counsel (Choate Hall & Stewart) to pursue those proceedings.  On June 27, 2022, Foret organized a phone call with Choate lawyers in which DeNaut agreed to participate. Ex. 36; ECF 89 at 62-63.  The call was friendly; the Choate lawyers did not assert that Coinmint was adverse to DeNaut; and DeNaut provided general background information. ECF 89 at 61-63.  The Choate lawyers did not offer to represent DeNaut and he did not have any impression from the call that they were acting as his lawyers.  *Id.* at 62.  DeNaut and Coinmint did not speak again until late 2022 when Foret reached out to ask DeNaut to speak with Attorney Alford of the law firm, Gordon Rees, who were Coinmint's new arbitration counsel.  ECF 89 at 63, 217.

### f.   Alford's pre-call assertions re: attorney-client relationship

Prior to speaking with DeNaut on January 6, 2023, Attorney Alford asserted to Katena that he represented DeNaut.  On December 9, 2022, Katena had asked Coinmint to designate a corporate representative to testify in the arbitration regarding specified topics.  Ex. R at 062-63. On December 20, Alford responded that DeNaut was likely to be the person most knowledgeable on two topics and added that "it is my understanding that we are close to securing Mr. DeNaut's agreement to appear voluntarily for deposition, despite the fact that he is no longer affiliated with Coinmint." *Id.* at 058-59.  On December 22, Katena's counsel, Jacob Taber, Esq., asked Alford to clarify whether he would be representing DeNaut in the arbitration.  *Id.* at 055.  Alford's December 23 response did not answer the question, so Attorney Taber repeated it.  Ex. X at 018-

19. Alford then replied that he would "let you know next week." Ex. R at 053. Alford understood that Taber was pressing for an answer because Taber wanted to know whether he could contact DeNaut directly. ECF 90 at 85:23-87:13.

On December 28, during a meet-and-confer, Attorney Alford "told Taber that we can now confirm we represent DeNaut and that, to the extent he ends up being a PMK deponent, we will product him on a mutually-agreeable date." Ex. V (email from Alford to Foret); Ex. BB at 102, 105. However, despite asserting that he represented DeNaut, Alford actually never spoke to him until the January 6, 2023 phone call. *See* ECF 90 at 47:18-19 ("I had never spoken to him as of that point").

### 2. January 6 phone call

The January 6 call, on which Alford took the lead, was organized by Foret and attended by DeNaut, Foret, and Attorneys Alford and Lemus of Gordon Rees. ECF 89 at 63-65, 234, 228:9-11; ECF 90 at 61:1-4. It lasted approximately 65 minutes, ECF 89 at 73:1-3; ECF 90 at 98:8-12.

#### a. Disputed facts re: January 6 call

Material aspects of the January 6 call are in dispute. DeNaut testified at the hearing in this matter that Alford began the phone call by identifying himself as Coinmint's arbitration counsel and then stated that DeNaut's testimony could be helpful to Coinmint, asked for DeNaut's availability to testify, offered to represent DeNaut as a witness in the arbitration including preparing him for the hearing and sitting next to him, and stated that Coinmint would pay for the representation, which DeNaut verbally accepted. ECF 89 at 65:21-67:12. DeNaut stated he felt relieved to hear he was represented and was on Coinmint's side as opposed to being "just a general witness," and he then shared "certain matters that were open in [his] mind" so

13

they could have a discussion. *Id.* at 71:4-17. DeNaut further testified that the conversation was specific and detailed, that he relayed concerns about potential problem areas for Coinmint – including with respect to negotiation of the contract, execution, and ability to pay – and sought legal advice on how to present his testimony in a favorable light, which Alford provided. [9] *Id.* at 69:15-71:3, 72:4-17, 94:9-95:5, 176:4-16, 183:24-184:8. DeNaut emphasized that he would not have shared these facts and concerns had he not believed that the conversation was privileged. *Id.* at 95:1-5. For comparison, he testified that his earlier conversation with Coinmint's prior counsel (Choate Hall & Stewart) was limited to general background information because Choate did not purport to represent him and he understood the conversation was not privileged. *Id.* at 71:18-72:4, 167:21-168:13.

In contrast, Alford testified that he did not offer to represent DeNaut during the January 6 call, ECF 90 at 61:8, and Foret testified that he did not "recall" Alford doing so, ECF 89 at 228:9-17. Alford testified that as soon as he identified himself as Coinmint's counsel, his mindset changed "dramatically" because DeNaut blurted out information that was similar to a core position that Katena was advancing in the arbitration. ECF 90 at 47-48, 137. Alford says he viewed this as a "red flag" indicating a potential conflict between DeNaut and Coinmint, so he decided to reserve decision on whether to offer representation. *Id.* at 136:20-137:5. Nonetheless, Alford went on talking to DeNaut for a little over an hour "to see if there was

---

[9] During his testimony, DeNaut invoked privilege over statements he made and advice he received during the January 6 call and therefore testified only as to their general subject matter. *See*, *e.g.*, ECF 89 at 175-76. Relatedly, Attorney Alford produced his notes of the January 6 call and testified to certain mental impressions regarding DeNaut subject to the Court's order that any disclosure of attorney work product would not operate as a waiver outside the context of the instant matter. The notes were admitted into evidence under seal. Ex. 51. They consist of approximately 12 handwritten sentences relating to the 65 minute call and do not reference any discussion about representation of DeNaut or any concerns about a conflict of interest between DeNaut and Coinmint. *Id.*

something that could be salvaged from this individual as a witness that would be helpful. And he did." *Id.* at 115, 120-121.

### b.   Undisputed facts re: January 6 call

Certain material facts concerning the January 6 call are not in dispute.  Attorney Alford admits that he told Katena's counsel in December 2022 that he represented DeNaut because "that was the plan at the time" and that he went into the January 6 call intending to offer to represent DeNaut.  *Id.* at 95, 136-137.  It is further undisputed that, during the call, Alford did not say that he did <u>not</u> represent DeNaut and did not warn DeNaut that Coinmint, Alford's client, might be adverse to him.  ECF 89 at 305:18-306:5; ECF 90 at 116-120.  Shortly after the call, DeNaut spoke to Foret, who asked for emails between DeNaut and Henry Monzon, Katena's former CEO.  ECF 89 at 74-75.  DeNaut subsequently forwarded between 18 to 30 relevant emails, including emails between DeNaut and Monzon.  *Id.* at 74-75, 229-30.  DeNaut testified he would not have done so if he believed Coinmint was adverse to him.  *Id.* at 74-76.

### 3.   Alford's post-call assertions re: attorney-client relationship

Meanwhile, just a few hours after the January 6 call, Alford emailed the arbitration panel and stated in relevant part: "I can confirm that we can produce Mr. DeNaut in New York on a mutually-agreeable date the week of February 13."  Ex. Z at 066.

However, on January 13, following review of documents produced by Katena in connection with the arbitration, Alford informed Katena's counsel: "The documents Katena recently produced reveal a previously unknown conflict of interest that precludes our law firm from representing or producing for deposition Messrs. DeNaut or Maloney."  Ex. 38; ECF 90 at 69.  Then, on January 26, 2023, three weeks after the January 6 call, Alford filed a lawsuit on behalf of Coinmint against DeNaut, among other co-defendants, in the Superior Court of

California.  *See Coinmint, LLC v. Reddy et al.*, 23CV410979 (Cal. Super. Ct., Cnty. of Santa

Clara).  That action has since been removed to the United States District Court for the Northern

District of California.  *See Coinmint, LLC v. DX Corr Design, Inc.*, No. 3:23-cv-00599-RS (N.D.

Cal).

### 4.  Findings of fact

Having observed live testimony of DeNaut, Foret and Alford, considered all of the

evidence submitted, and weighed credibility, the Court finds DeNaut's testimony credible with

respect to the January 6 call.  Accordingly, the Court finds that (i) Attorney Alford expressly

offered to represent DeNaut at the outset of the phone call; (ii) Alford further stated that he

would send an engagement letter, prepare DeNaut, and sit next to him at the hearing, and that

Coinmint would pay for the representation; (iii) DeNaut shared his knowledge and views

regarding issues material to the arbitration and sought advice on how to present his testimony

and address potential weaknesses because he believed that he was being helpful to Coinmint and

that the conversation was privileged, and (iv) Alford provided that advice.

DeNaut's testimony on these points is credible for a number of reasons.  *First*, DeNaut's

version of events comports with common sense.  DeNaut is a sophisticated and seasoned

business professional who had already been on the receiving end of a litigation hold letter from

Coinmint's initial counsel (TCF) on November 16, 2021 suggesting that Coinmint had potential

claims against him.  Reacting with concern and caution, DeNaut immediately reached out to

Foret, who assured him that this letter was simply intended to be a document retention request

and that Coinmint and DeNaut remained on the same side.  Relatedly, when he received a job

offer from Katena in early November 2021, he alerted Foret and declined the offer.  DeNaut

continued to communicate with Foret extensively between November 2021 and January 2022 to

find a solution to the Katena/Coinmint contractual dispute only because he had received Foret's reassurance that Coinmint was not adverse to him. In July 2022, he participated in a call with Foret and its new counsel (Choate) but understood that the call was not privileged and so only provided general information.  He then did not hear from Coinmint until late 2022 when Foret asked him to speak with Coinmint's latest counsel, Gordon Rees.  In light of this course of conduct, it strains credulity to believe that DeNaut joined a phone conference with Gordon Rees attorneys with whom he had never spoken and began to spontaneously share details and concerns about the Coinmint/Katena matter without first ascertaining whether the situation posed any risk to himself.  Indeed, the Court finds it far more plausible that DeNaut engaged with Attorney Alford in a specific and detailed discussion and expressed views about the case only after being assured that Coinmint was not his adversary and, in fact, would provide him with representation. *Second*, DeNaut's testimony as to the content of the January 6 call is corroborated by the chronology of events, including Alford's December 28 email to Foret confirming that "[w]e told Taber that we can now confirm we represent DeNaut," Ex. V, the December 29 email from Katena's counsel stating that Attorneys Alford and Lemus "told me that [Gordon Rees] represents Mr. DeNaut," Ex. BB at 105, Alford's admission that his plan was to represent DeNaut and that he intended to discuss representation with DeNaut during the January 6 call, ECF 90 at 47, 137, and Alford's email to the panel in the hours after the call confirming that he could produce DeNaut for deposition in February, Ex. Z.

The Court does not credit either Attorney Alford's testimony that he did not offer representation during the call or Foret's testimony that he did not "recall" hearing such an offer. It is concerning that Alford made a definitive statement to Katena's counsel "confirming" that he represented DeNaut despite the fact that they had never spoken, and there is no evidence that

Foret, as Coinmint's general counsel managing Alford's work, expressed any qualms about this misstatement. This raises some general skepticism about their version of these events. As for the call itself, Alford's testimony that he refrained from offering representation because he learned of a potential conflict of interest is inconsistent with his conduct of the call. Presumably an experienced litigator such as Alford, upon hearing a "red flag" that made him "dramatically" change his thinking about potential conflicts, would immediately have warned DeNaut that he represented Coinmint only, that he did not represent DeNaut, and that Coinmint was potentially adverse to DeNaut. [10] Alford admits that he gave no such warnings and, nonetheless, continued to elicit information from DeNaut for more than an hour. The Court also does not credit Alford's testimony that the reason he emailed the panel later that day to confirm that he could produce DeNaut was because he did not want to reveal his "work product . . . about our evolving thinking on the subject" until he had decided what to do. ECF 90 at 104. It is implausible that an attorney who had just hit pause with respect to an intended representation would rush to create the opposite impression with the tribunal the very same day. Instead, the most consistent interpretation of these events is that Alford obtained DeNaut's agreement to representation

---

[10] Rule 4.3(a) of the California Rules of Professional Conduct provides in relevant part: "When the lawyer knows or reasonably should know that the unrepresented person incorrectly believes the lawyer is disinterested in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."

Similarly, Rule 4.3(a) of the Connecticut Rules of Professional Conduct provides in relevant part: "When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."

The American Bar Association's comment to Model Rule 4.3, as adopted verbatim in Connecticut, provides in relevant part: "In order to avoid a misunderstanding, a lawyer will typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person."

during the January 6 call, immediately notified the panel that he had the ability to produce

DeNaut, and then changed his mind the next week after reviewing new documents.  In Alford's

own words in his January 13 email, the putative conflict of interest between Coinmint and

DeNaut was "previously unknown" to him until he reviewed "recently produced" documents,

Ex. 38 at 42, which he did not have access to until the week after the January 6 call, *see* ECF 90

at 69-70.

DeNaut's testimony that he accepted an express offer of representation during the

January 6 call is further corroborated by the fact that he searched for relevant emails and

forwarded them to Foret in the hours after the January 6 call.  In an attempt to cast doubt on

DeNaut's testimony, Coinmint elicited testimony that DeNaut never contacted Alford after the

January 6 call to ask for an engagement letter.  However, it was Alford who was pursuing

DeNaut's testimony and managing the logistics, not the other way around, so it is unsurprising

that DeNaut did not reach out to Alford.  As DeNaut credibly testified, "I just thought that they

would get to it in time."  ECF 89 at 77:13-14.  The first logical prompt for DeNaut to contact his

counsel was the issuance of the arbitral summons four weeks after the call; however, in the brief

interim, Gordon Rees had abruptly filed suit against him on behalf of Coinmint.  Consequently,

the fact that DeNaut did not contact Gordon Rees in the weeks after the January 6 call does not

undermine his testimony as to what Alford said during the call.  The Court finds that Attorney

Alford made an express offer of representation on January 6 that DeNaut accepted and upon

which he relied.

**D.  DISCUSSION**

**1.  Limited disqualification of Gordon Rees**

**a.   Federal law governs disqualification by federal courts**

DeNaut contends that Gordon Rees should be disqualified from examining him in the arbitration because Attorney Alford previously formed an attorney-client relationship with him in connection with the same proceedings.  As cited above, district courts in the Second Circuit have repeatedly held that "[a]ttorney disqualification is better decided by courts rather than arbitrators."  *See Canfield v. SS&C Techs. Holdings, Inc.*, No. 18-cv-10252 (ALC), 2021 WL 1022698, at *2-3 (S.D.N.Y. Mar. 17, 2021) (citing cases).  Federal courts apply federal law to questions of disqualification, although they may benefit from guidance offered by the American Bar Association and state disciplinary rules.  *See Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005).  Accordingly, federal law applies to motions in federal court to disqualify an attorney from an arbitration.  *See, e.g.*, *Simply Fit of N. Am., Inc. v. Poyner*, 579 F. Supp. 2d 371, 384–85 (E.D.N.Y. 2008). [11]  Here, because Attorney Alford is a member of the California bar and DeNaut is a resident of Connecticut, the Court has consulted the Rules of Professional Conduct of both states for guidance. [12]

---

[11] *See also*, *e.g.*, *Schorr v. Am. Arb. Ass'n Inc.*, No. 21-cv-5569 (PAE), 2022 WL 17965413, at *3 n.4 (S.D.N.Y. Dec. 27, 2022); *Utica Mut. Ins. Co. v. Emps. Ins. Co. of Wausau*, No. 6:12-cv-1293 (NAM)(TWD), 2014 WL 4715712, at *4 (N.D.N.Y. Sept. 22, 2014); *Nw. Nat. Ins. Co. v. Insco, Ltd.*, No. 11-cv-1124 (SAS), 2011 WL 4552997, at *5 (S.D.N.Y. Oct. 3, 2011); *Gwertzman v. Gwertzman, Pfeffer, Tokar & Lefkowitz*, No. 87-cv-6824 (JFK), 1988 WL 138149, at *3 (S.D.N.Y. Dec. 12, 1988).

[12] In both California and Connecticut, Rule 8.5(a) provides that a lawyer is subject to the state's Rules of Professional Conduct if he is admitted there or provides or offers to provide legal services there, and may be subject to the disciplinary authority of more than one jurisdiction for the same conduct.

### b. Test for disqualification based on prior representation

The authority to disqualify attorneys derives from a federal court's inherent power to "preserve the integrity of the adversary process." *Hempstead Video*, at 132 (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). As articulated by the Second Circuit, not every violation of a disciplinary rule will necessarily lead to disqualification, and disqualification is only warranted where "an attorney's conduct tends to taint the underlying trial." *Id.* (quoting *Nyquist*, at 1246). In making this determination, the court must be wary of disqualification motions filed solely for tactical purposes and must balance "a client's right freely to choose his counsel" against "the need to maintain the highest standards of the profession." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983). Accordingly, the movant bears a "heavy burden" of proof. *Id.* Nonetheless, "doubts should be resolved in favor of disqualification." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).

"One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client." *Hempstead Video*, 409 F.3d at 133. The standard for disqualifying an attorney based on a prior representation is the same whether the person seeking disqualification is a party or a non-party witness. *See Scantek Med., Inc. v. Sabella*, 693 F. Supp. 2d 235, 239 (S.D.N.Y. 2008) (citing *Lund v. Chemical Bank*, 107 F.R.D. 374, 376-77 (S.D.N.Y. 1985) (granting motion to disqualify party's counsel from examining non-party witness)). In such cases, an attorney may be disqualified if:

> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video*, at 133 (citing *Evans*, 715 F.2d at 791).  This test is consistent with Rule 1.9(a) of the Rules of Professional Conduct of both California and Connecticut. [13]

### i.   Former client of adverse party's counsel

The test for disqualification is satisfied here.  Regarding the first element, it is undisputed that Attorney Alford's current client, Coinmint, is presently adverse to DeNaut insofar as it is pursuing parallel litigation against him in the Northern District of California.  *See*, *e.g.*, *Lund*, 107 F.R.D. 376 (finding that defendant was adverse to non-party witness, who was former client of defendant's counsel, given "real possibility" that defendant would use information it sought from witness to assert claims against him).  The Court also finds that DeNaut is a former client of Alford.  Under California law, [14]

> It is elementary that the *relationship* between a client and his retained (or noncourt-appointed) counsel arises from a contract, whether written or oral, implied or expressed. . . .  An attorney-client relationship can be formed though no retainer is signed or no fees are paid.  When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*.  The absence of an agreement with respect to the fee to be charged does not prevent the relationship from arising.  Contractual formality is not required.

*Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 79 Cal. App. 4th 114, 126 (2000) (citations and quotation marks omitted; emphasis retained), cited in *Markel Am. Ins. Co. v. Allison*, No. 22-cv-1494 (JLS)(PVC), 2023 WL 3150077, at *2 (C.D. Cal. Mar. 15, 2023)

---

[13] Rule 1.9(a), which is identical in California and Connecticut, provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent."

[14] When determining whether an attorney-client relationship existed, federal courts have looked to state law for guidance.  *See*, *e.g.*, *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) (taking guidance from canons of professional conduct adopted in New York); *Papyrus Tech. Corp. v. New York Stock Exch., Inc.*, 325 F. Supp. 2d 270, 277 (S.D.N.Y. 2004) (same).

(analyzing existence of attorney-client relationship in legal malpractice suit).  Although Connecticut law in this area is less developed, similar principles apply. [15]  Here, Alford explicitly offered to represent DeNaut during the January 6 phone call, and DeNaut relied on that offer over the course of that 65-minute conversation, including warning Alford about potential weaknesses and seeking advice on how to address them, which Alford provided.  That was sufficient to establish an attorney-client relationship, even in the absence of a written agreement. *See*, *e.g.*, *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1152 (1999) (finding attorney-client relationship where attorney, whom party ultimately decided not to retain, prospectively received information from party's counsel concerning party's theories of the case, analysis of the issues, and discovery strategy and then provided feedback after researching).

Having failed to credibly dispute the express offer and acceptance during the January 6 call, Coinmint's fallback position is that DeNaut was so adverse to Coinmint that he could not have reasonably believed that Alford could represent both of them.  Under California law, the question of reasonable belief arises where the putative client claims the existence of an *implied* – rather than *express* – attorney-client relationship, which is a question of law resolved through an "objective test."  *Luna Gaming-San Diego LLC v. Dorsey & Whitney, LLP*, No. 06-cv-2804 (BTM)(WMC), 2009 WL 587801, at *3 (S.D. Cal. Mar. 6, 2009).  "Courts focus on whether it would have been reasonable, taking into account all of the relevant circumstances, for the person claiming the attorney-client relationship existed to have believed that she was in fact a 'client' of the lawyer."  *Id.* (citing *Sky Valley Ltd. Partnership v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 652

---

[15] *See DiStefano v. Milardo*, 276 Conn. 416, 422 (2005) (in Connecticut, "[a]n attorney-client relationship is established when the advice and assistance of the attorney is sought and received in matters pertinent to his profession"); *Stardust, LLC v. Moran*, No. CV126032322S, 2015 WL 5136846, at *6 (Conn. Super. Ct. July 28, 2015) (absence of retainer agreement was not dispositive to whether attorney-client relationship existed).

(N.D. Cal. 1993)). [16]  California courts may consider various factors under this objective test,

including some additional factors when a party claims that it was jointly represented along with

an attorney's undisputed client.  *Id.*  Two such additional factors are "the conduct of the parties

towards one another" and "the extent of common interests between the allegedly jointly

represented parties."  *Id.*

       In this case, because the Court has found that Alford and DeNaut *expressly* agreed to

form an attorney-client relationship during the January 6 call, it has no occasion to determine

whether DeNaut reasonably believed there was an *implied* agreement.  Nor has Coinmint cited

any authority for the proposition that an express attorney-client relationship could be void *ab*

*initio* based on the client's secret knowledge of a conflict of interest, as Coinmint alleges here.

Moreover, even assuming that the reasonableness of DeNaut's belief were a relevant inquiry in

this case, he and Coinmint did have common interests as of January 6, 2023, as discussed in

more depth below, such that it was reasonable for him to believe that Alford could jointly

represent them both.  Put another way, there is insufficient evidence to conclude that DeNaut had

a conflict of interest with Coinmint that would render it unreasonable for him to accept an offer

of joint representation as of January 6, [17] despite the fact that they subsequently became adverse

---

[16] Connecticut law makes passing reference to the reasonable belief criterion but is not well
developed on that point.  *See Parimal v. Manitex Int'l, Inc.*, No. 3:19-cv-1910 (MPS), 2021 WL
363844, at *4 (D. Conn. Feb. 3, 2021) (Merriam, M.J.) (noting a dearth of Connecticut law on
the issue).

[17] The Court finds that the November 16, 2021 letter from TCF Law Group stating that Coinmint
might have potential claims against DeNaut did not render them materially adverse, given
Foret's immediate assurance that DeNaut was aligned with Coinmint and that the true purpose of
the letter was to ensure document retention, and given that Foret and DeNaut continued working
closely on Coinmint's goal of resolving the Katena dispute.  Coinmint also suggests that
DeNaut's effort to determine whether Katena had the capacity to engage in bitcoin mining
operations that would place it in direct competition with Coinmint created an adverse interest to
Coinmint.  However, DeNaut testified that this was a critical component of the feasibility of

24

when Coinmint sued DeNaut a few weeks later.  For all the foregoing reasons, DeNaut has met his burden of demonstrating that he is a former client of Attorney Alford.

### ii.  Substantial relationship

Regarding the second element for disqualification based on prior representation, it is obvious that there is a substantial relationship between the subject matter of Attorney Alford's prior representation of DeNaut and the issues in the arbitration.  In fact, they are one and the same: Alford agreed to represent DeNaut as a witness in the arbitration but now is poised to cross-examine him in that same proceeding.

### iii.  Confidences

The third element of the disqualification test – namely, access to relevant privileged information – is similarly straightforward under the circumstances.  Because the same individual lawyer (Attorney Alford) participated in the prior (DeNaut) and current (Coinmint) representations, there is an irrebuttable presumption that confidences were shared.  *See United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 240 (2d Cir. 2016). [18]  The purpose of this rule is to enforce "the lawyer's duty of absolute fidelity" and to maintain "the spirit of the rule relating to privileged communications."  *Id.* (citing *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 570 (2d Cir. 1973)); *see also Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 740 (2d Cir. 1978)

---

finding an alternate purchaser, which was a solution he was investigating in coordination with Coinmint.  Moreover, that idea never came to fruition, the feasibility study came to an end in March 2022, DeNaut had no further communications with Katena after June 2022, and he never received any compensation from Katena.  Accordingly, there is no basis for the Court to conclude that DeNaut was materially adverse to Coinmint as of the January 6 phone call, even if such an inquiry were relevant.

[18] *Cf. Laskey Bros. of W. Va. v. Warner Bros. Pictures*, 224 F.2d 824, 827 (2d Cir. 1955) (where prior counsel and current adverse counsel were different attorneys in same firm, presumption of shared confidences is rebuttable).

(requiring proof that privileged information was accessed or exchanged during the prior representation "would put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether").  Consequently, Coinmint's argument that DeNaut did not share confidential information during the January 6 call is unavailing, and the third element is satisfied.  In sum, DeNaut has demonstrated that the present circumstances require disqualification.

### c.  Imputation of conflicts to firm

An attorney's conflicts are ordinarily imputed to his firm based on the rebuttable presumption that associated attorneys share client confidences.  *See Hempstead Video*, 409 F.3d at 133.  To rebut the presumption, the firm must show that the "practices and structures that protect client confidences within a firm" are "sufficient to avoid disqualifying taint."  *Id.* at 137. For example, in *Hempstead Video*, a plaintiff sought to disqualify defendant's counsel on the ground that a different attorney who was "of counsel" to the firm was representing the plaintiff in another matter.  *Id.* at 129-30.  The Second Circuit declined to impute the potential conflict to the firm because the of-counsel attorney "maintained separate files and shared no confidences" with the firm relating to the plaintiff and the firm "adopted measures . . . upon becoming aware of the potential conflict to protect against any breach."  *Id.* at 138.

In the present matter, Coinmint did not submit any evidence of efforts by Gordon Rees to quarantine the client confidences that DeNaut shared with Attorney Alford in order to avoid a disqualifying taint, nor did Coinmint address this issue in its pre- or post-hearing briefs.  The Court recognizes that the imputation of conflicts question was overshadowed by other complex procedural and substantive issues in the run-up to the hearing.  However, several considerations

weigh against affording Coinmint a late opportunity to address it. *First*, Coinmint has been on notice from the start that the Court would consider imputation if it found that Alford and DeNaut formed an attorney-client relationship, insofar as DeNaut sought imputation in its state court application, *see* ECF 33-1 at 1, 46, and the Court raised the question again during a prehearing conference, *see* ECF 46 at 31:11-12. *Second*, the parties agreed to consolidate issues raised in the state court application into the instant proceedings for the express purpose of obtaining an expedited resolution. Inviting another round of submissions on the imputation question would further delay resolution of both this matter and the arbitration. *Third*, it appears that any attempt by Gordon Rees to rebut the sharing of DeNaut's confidences within the firm would be fruitless. Gordon Rees's involvement with DeNaut has spread from the arbitration to state and federal court in Connecticut in addition to a lawsuit in California. Along the way, at least six Gordon Rees partners (Attorneys Alford, Lemus, Liu, Zakrzewski, and Drury) from three offices (San Francisco, Houston, and Hartford) have been directly involved, which implies that related information may have been disseminated to associate attorneys and support staff as well. *Fourth*, Gordon Rees' ability to employ effective screening procedures in this instance is even more doubtful given that Attorneys Alford and Liu are actively litigating claims against DeNaut on behalf of Coinmint in the Northern District of California based on the same facts underlying the arbitration. *See*, *e.g.*, *Jackson Hole Burger, Inc. v. Est. of Galekovic*, No. 23-cv-4922 (JSR), 2023 WL 5112925, at *5 (S.D.N.Y. Aug. 10, 2023) ("any screening at this point would be completely ineffective, given how involved [the conflicted attorney] has already been in the present lawsuit") (citing *Blue Planet Software, Inc. v. Games Int'l, LLC*, 331 F. Supp. 2d 273, 278 (S.D.N.Y. 2004) ("implementing a screening procedure to separate [the attorney] from the rest of [the firm] now would be bootless because [the lawyer] has already been substantially

involved in this matter.")). For all these reasons, imputation of Attorney Alford's conflict and disqualification of the entire Gordon Rees firm is the appropriate safeguard under the circumstances.

### d.   Limit on disqualification

The Court credits Coinmint's concern that disqualification will cause substantial hardship given Attorney Alford's extensive work on the arbitration.  The Court will strike the balance by ordering a limited disqualification such that Gordon Rees shall have no involvement, either directly or indirectly, in the examination of DeNaut in the arbitration.  Meanwhile, Coinmint may continue using Gordon Rees for any other aspect of the arbitration if it so chooses.  *See*, *e.g.*, *Lund*, 107 F.R.D. at 377 (limited disqualification of party's counsel solely for purpose of conducting discovery of former client, a non-party witness, both prevented potential harm to former client and mitigated prejudice and inconvenience to party).

### 2.   Protection of DeNaut's privileged communications

Turning to DeNaut's second request for relief, he claims that his communications during the January 6 phone call were privileged, and he seeks an order prohibiting Coinmint and Gordon Rees from "using" that information.  *See* ECF 19 at 25.  Coinmint argues in opposition that DeNaut waived the privilege because Coinmint's general counsel, Randy Foret, was on the call.  Ordinarily a holder of the attorney-client privilege waives it by voluntarily disclosing the privileged communication to a third party.  *See Moeller v. Superior Ct.*, 16 Cal. 4th 1124, 1136, (1997) (citing Cal. Evid. Code, § 912). [19]  However, "[t]he privilege survives disclosure to a

---

[19] The Court applies California law to issues of privilege in this matter pursuant to a choice of law analysis.  A federal court sitting in diversity applies the choice of law rules of the state in which it sits.  *See Parimal*, 2021 WL 363844, at *2.  In Connecticut, the court must first ask whether there is an outcome determinative conflict between the applicable laws and, if so, which state has the most significant relationship to the issues.  *Id.* at 3.  At particular issue here is the

party with a common interest . . . if it is necessary to accomplish the privilege holder's purpose

in seeking legal advice." *See Citizens for Ceres v. Superior Ct.*, 217 Cal. App. 4th 889, 914-17

(2013) (citing Cal. Evid. Code § 952 (privilege attached to communications between attorney

and client in the presence of third parties "who are present to further the interest of the client in

the consultation"); *and* Cal. Law Rev. Comm'n Comments to § 952 ("These words refer, too, to

another person and his attorney who may meet with the client and his attorney in regard to a

matter of joint concern.")). For the common interest doctrine to attach, the parties must "have in

common an interest in securing legal advice related to the same matter" and the communication

must "be made to advance their shared interest in securing legal advice on that common matter."

*Getz v. Superior Ct.*, 72 Cal. App. 5th 637, 655 (2021) (quoting language originating in *First

Pacific Networks, Inc. v. Atl. Mut. Ins. Co.*, 163 F.R.D. 574, 581 (N.D. Cal. 1995)).

     As noted above, Coinmint contends that DeNaut was secretly loyal to Katena, Coinmint's

adversary in the arbitration, such that DeNaut could not have common interest with Coinmint

regarding his testimony. In particular, Coinmint cites messages between DeNaut and Katena,

including the offer of an advisory role on November 5, 2021 in exchange for an equity position.

---

common interest doctrine providing that disclosure to a third party does not waive the privilege
in certain circumstances. Connecticut has not developed its own version of the doctrine but,
rather, cites to decisions of other federal and state courts for its broad contours. *See*, *e.g.*, *Metro.
Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 249 Conn. 36, 61 n.31 (1999); *Raymond Rd. Assocs., LLC
v. Taubman Centers, Inc.*, No. CV075007877S, 2009 WL 4069251, at *8 (Conn. Super. Ct. Oct.
30, 2009). In contrast, California has developed a distinct interpretation of the doctrine as a
nonwaiver exception rather than a standalone privilege, which is enshrined by statute in the
California Code of Evidence. *See*, *e.g.*, *Citizens for Ceres v. Superior Ct.*, 217 Cal. App. 4th
889, 914-17 (2013) (citing Cal. Evid. Code §§ 912 and 952). Because California has both the
stricter approach and the most significant relationship to the issue – including because Attorney
Alford, the arbitration, and Coinmint's pending lawsuit against DeNaut are all in located in
California – the Court will apply California law to questions of privilege herein. *See*, *e.g.*,
*Parimal*, at *6-7 (applying law of Illinois because its rule was "stricter" and it had more
significant relationship to parties and their contract).

Ex. K.  However, other evidence in the record demonstrates that DeNaut had disclosed to Foret that Katena had made a job offer and that DeNaut, despite initially saying he would be "thrilled" to work with Katena and would review the job offer, *see* Ex. 18, declined the offer four days later, confirmed to Foret that he was not working for Katena, and never received any compensation from Katena, monetary or otherwise, *see* ECF 89 at 49:3-14, 194:4-9, 241:19-24, 266:8-10.  Coinmint also alleges that DeNaut knew that Coinmint's CFO was disloyal but did not alert Coinmint, that he strung Coinmint along at Katena's behest, and that he was secretly helping Katena set up a Bitcoin mining operation in direct competition with Coinmint.  Coinmint Br., ECF 80 at 8.  However, these allegations are not supported by the record currently before the Court.  The record does demonstrate that DeNaut spent considerable time and effort attempting to broker a solution between Coinmint and Katena, including investigating whether someone might "step into Coinmint's shoes" as an alternative purchaser by reimbursing Coinmint's $23 million and assuming its contractual rights and obligations.  Whether Katena could develop a bitcoin mining operation was a key component of this feasibility study.  DeNaut communicated extensively with Foret during this process, including with specific reference to the alternative purchaser concept until he himself began considering stepping into Coinmint's shoes, at which time he signed an NDA with Katena for purposes of conducting due diligence and, consequently, reduced his communications with Foret.  Ex. I, M, N, O.  Once DeNaut decided that this solution was not economically feasible in March 2022, he curtailed communications with Katena and last spoke to Katena in June 2022.  ECF 89 at 55.  He never brought a bitcoin mining operation to fruition for Katena.  Thereafter, he assisted Coinmint in the arbitration, including meeting with Coinmint's second set of lawyers (Choate) on June 27, 2022 at Foret's request.  *Id.* at 61-63.  Furthermore, DeNaut credibly testified that some of the information he shared with Attorney

Alford during the January 6 phone call identified potential weaknesses in Coinmint's case, and he sought Alford's guidance as to how to manage them favorably when he testified.  *Id.* at 69:15-71:3, 72:4-17, 176:4-16, 183:24-184:8.

In sum, the evidence demonstrates that as of the January 6, 2023 call, Coinmint and DeNaut were not adverse and, in fact, had "in common an interest in securing legal advice related to the same matter" and that DeNaut's communications were "made to advance their shared interest in securing legal advice on that common matter."  *See First Pacific*, 163 F.R.D. at 581.  As a result, DeNaut's communications to Alford and the advice he received are subject to the attorney-client privilege.  Neither Coinmint, nor Gordon Rees may unilaterally waive DeNaut's privilege in the arbitration.  *See Bank of Am., N.A. v. Superior Ct.*, 212 Cal. App. 4th 1076, 1096 (2013) ("Each of the joint clients holds the privilege protecting their confidential communications with the attorney; one client may not waive the privilege without the consent of the other.").  As one consequence, Coinmint, Foret, and Gordon Rees may not disclose DeNaut's privileged information to replacement counsel given that new counsel was not part of the common interest meeting, DeNaut has not authorized such disclosure, and disclosure of the privileged information to Attorney Alford's replacement would revive the taint and thwart the very purpose of the disqualification.  Nonetheless, although Coinmint may not testify in the arbitration – and its replacement counsel may not elicit testimony – concerning statements made by DeNaut or legal advice given to him during the January 6 call, they are not precluded from testifying or inquiring about underlying facts known to DeNaut independent of the January 6 call.  *See*, *e.g.*, *Benge v. Superior Ct.*, 131 Cal. App. 3d 336, 349 (Ct. App. 1982) ("[T]he attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts upon which the communications are based.").

**E.  ORDERS**

For the reasons set forth above, Katena's Motion to Compel is GRANTED subject to the following orders: (1) The Gordon Rees firm is disqualified from any involvement in the examination of non-party witness Jim DeNaut in the pending arbitration between Coinmint and Katena, AAA Case No. 01-22-0001-7627, including that Gordon Rees may not provide advice or input to Coinmint or to replacement counsel in connection with that examination; and (2) Coinmint, Foret, and Gordon Rees may not disclose – and replacement counsel may not elicit testimony about – statements made or legal advice received by Mr. DeNaut during his January 6, 2023 call with Gordon Rees attorneys.

These orders pertain to the arbitration pending between Coinmint and Katena.  This ruling expressly does not reach the questions of (a) whether it is proper for Gordon Rees to represent Coinmint in its pending parallel lawsuit against DeNaut, and (b) whether or how Coinmint or Gordon Rees may "use" DeNaut's privileged communications for the purposes of that suit.[20]  This Court defers to the Northern District of California's determination of issues arising in that action.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of

---

[20] *See* Cal. Code. Evid. § 962 (joint clients may not claim privilege against each other in subsequent civil proceeding between them).

Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

      SO ORDERED, this 4th day of October, 2023, at Bridgeport, Connecticut.

*/s/ S. Dave. Vatti*
S. DAVE VATTI
United States Magistrate Judge
